**BOISSONNAS v. ACHESON, Secretary of State.**

United States District Court
S. D. New York.
Oct. 19, 1951.

Finch & Schaefler, New York City (Edward R. Finch, Charles M. Arak, New York City, of counsel), for plaintiff.

John M. Cunneen, O. V. Maresca, Asst. U. S. Attys., New York City (Irving H. Saypol, U. S. Atty., New York City, of counsel, for defendant.

NEVIN, District Judge (Sitting by designation).

## I.

### The Issue

This is an action brought pursuant to the provisions of the Declaratory Judgment Act, T. 28 U.S.C. § 2201, and the Nationality Act of 1940, T. 8 U.S.C.A. § 903, for a declaratory judgment to the effect that plaintiff is, and always has been, a National and a citizen of the United States.

The action is properly brought and this Court has jurisdiction. Perkins v. Elg, 307 U.S. 325, 349–350, 59 S.Ct. 884, 83 L.Ed. 1320.

In her Amended Complaint, plaintiff prays "for a judgment declaring that plaintiff is, and always has been, a national and citizen of the United States; that the instrument executed by her on December 12, 1933 did not and does not constitute an act

of expatriation from the United States or a renunciation of her citizenship thereof under the provisions of Section 2 of the Act of March 2, 1907 [34 Stat. 1228]; and that plaintiff is entitled to all rights and privileges as an American citizen of the United States; * * *"

Defendant, for the reasons alleged in his Amended Answer, asserts that plaintiff is not entitled to the relief sought. He asks for judgment dismissing the complaint and for his costs.

## II.

### Résumé of the Facts.

There is no disagreement as to substantially all of the facts. The facts are set forth in the court's Findings of Fact, hereinafter incorporated herein, and made a part of this Decision. It would be a work of supererogation to repeat them in too much detail here. However, a résumé, as brief as possible, may be helpful to an understanding on what the court bases its ultimate conclusion.

The dispute between the parties is not so much as to what the facts are, but as to the inferences to be drawn from them; the law which applies to them, and as to the credibility of some of the witnesses. Here, as in all cases, the decision must rest on the facts of the case, as shown by the record and the law, as it applies to them.

In Savorgnan v. U. S., 338 U.S. 491, 70 S.Ct. 292, 293, 94 L.Ed. 287, the Supreme Court at the outset say: "The question is whether, *under the special circumstances of this case,* a native-born American citizen who became an Italian citizen in 1940, and lived in Italy with her husband from 1941 to 1945, nevertheless retained her American citizenship". (Italics ours.)

Plaintiff is a native born American citizen. She was born in New York City on June 4, 1914, the daughter of Dr. Ralph Waldo Lobenstine and his wife, Anne Munroe Williams Lobenstine, both of whom in turn, were themselves native American citizens. Dr. Lobenstine was born in Kansas; his wife in Syracuse, N. Y. Plaintiff has one brother, also a native born American citizen.

Dr. Lobenstine died on March 21, 1931. During his life, and at the time of his death, he was a man of some means. (On October 24, 1938, "the assets constituting the principal of the trust shares for plaintiff, had a value of exactly $185,004.88" (Tr. P 405). At the time of her father's death, plaintiff was a minor. Her aunt, Miss Belle Lobenstine, and Mr. Henry Forster, both residents of New York City, were appointed executors and trustees of her father's estate.

Under her father's will, plaintiff was to receive the income from approximately one-half of the trust estate and to receive the principal thereof, one-half at the age of thirty, and the other half at the age of thirty-five.

Sometime prior to October, 1922, plaintiff's father and mother were divorced. In October, 1922, her mother married Henry Aylmer, a Canadian, and thereafter, made her home in Montreal, Canada.

During her earlier years, plaintiff attended school in the United States. She graduated from Miss Shipley's School, Bryn Mawr, Pennsylvania, in 1931, having spent seven years there. From Miss Shipley's School she went to Vassar, where she remained for one year. After that she went to France to the Sorbonne. During these years she had studied French and attended courses in French at the Sorbonne. She arrived in France in 1932 at the beginning of the school year and while there, she met her future (and present) husband, Remi Boissonnas. They became engaged and were married in New York City on December 16, 1933.

Plaintiff desired, if possible, to have a civil marriage at the office of the French Consulate in New York. On October 30, 1933, plaintiff was in Montreal with her mother. On that date, plaintiff inquired by letter of the French Consulate in New York whether a civil marriage before a French Consulate officer could be arranged. By letter, dated November 2, 1933, a reply was sent to plaintiff from the French Consulate, suggesting some difficulties.

On November 5, 1933, plaintiff again wrote to the French Consulate in New

York (Ex. 2) as follows: "November 5th, Dear Sir, I just received your letter of the second concerning my marriage to Monsieur Remi Boissonnas. Before my marriage, I intend to declare my desire to become a french citizen. If I do this, is a civil marriage still impossible? I understand also that, by the new laws, I do not lose my american citizenship, but in any case, I plan to become french. Will you again be good enough to let me know about this? Monsieur Boissonnas is very anxious to know. I am very sorry to bother you. Sincerely yours, (Miss) Mary Louise Lobenstine c/o Mrs. H. G. Locke, 1456 Crescent St., Montreal, Canada".

In response to this letter, plaintiff received a reply from the Consul General for France in New York, dated November 8, 1933 (Exs. 3 and 3A) in which he states among other things that: "The French Law in the case of a marriage between a person of foreign birth and a French citizen prescribes the following (I quote from the Decree of August 10, 1927, Art. 10):

(Par. 3) "When the foreign woman who marries a Frenchman outside of France does not necessarily acquire the nationality of her husband through her marriage and intends to claim the French nationality, pursuant to article 8 of the law of August 10th, 1927, she must file a declaration to such effect with a French diplomatic or consular agent, before the marriage is performed.

(Par. 4) "The interested party must submit, together with her birth certificate, the certificate of law provided by article 9 of the decree of August 10th, 1927. The declaration is made in triplicate; one copy is filed with the records of the Embassy, Legation or Consulate where the act has been executed; the second copy is given to the interested party, and the third copy is addressed to the Chancellery, together with an exemplified copy of the marriage certificate.

(Par. 5) "It does not follow that if you sign the aforesaid 'declaration', a civil marriage will be possible at the Consulate, as it is a declaration of intention which becomes effective when the marriage has been celebrated and makes you acquire the French citizenship immediately upon completion of the marriage ceremony.

(Par. 6) "The Certificate de Coutume (Certificate of Law) above mentioned is delivered by a duly recognized American Attorney or Counsellor at Law, either a resident in Paris or a local one. This document to confirm the provision of the 'Cable Act' U.S.Federal Law September 22, 1922, Art. [§] 3:

(Par. 7) "An American woman shall not cease to be an American as a result of her marriage, after the adoption of the present law, unless she expressly renounces her nationality before a tribunal having jurisdiction in matters of naturalizations of aliens. With this exception, any American woman who will marry a foreigner not susceptible to become a citizen of the United States shall cease to be an American.

(Par. 8) "If you comply with the above, as a consequence you will possess both the French and American nationalities."

After the receipt of this letter, plaintiff did (on December 12, 1933) sign a document entitled "Declaration" (Exs. 4, 4A and Y4) with which she submitted the documents required in Paragraph 4 of the letter of the Consul General, dated November 8, 1933 (Exs. 3 and 3A). There was, however, no civil marriage before the French Consul in New York, (Ex. T. P 8, Tr. P 62). Plaintiff was married "at the Union Theological" in New York City.

The Consul General based his opinion (Ex. 3) on the words of the Cable Act, September 22, 1922, 42 Stat. 1022, namely, "That a woman citizen of the United States shall not cease to be a citizen of the United States by reason of her marriage after the passage of this Act, unless she makes a formal renunciation of her citizenship before a court having jurisdiction over naturalization of aliens".

Between 1925 and the time of her graduation from Miss Shipley's School, plaintiff spent two summers in Europe. In 1925, she obtained an American passport (Ex. a). In 1929, she obtained a new American passport to visit France, England and other countries in Europe. (Ex. T. P 2). In

1932, while at the home of her mother in Montreal, she applied to the American Vice-Consul at Montreal, Canada for renewal of her 1929 American passport (Ex. A). Her 1929 American passport was revalidated and she embarked for France to enter upon her studies at the Sorbonne.

On June 1, 1933, she was issued a new American passport at the American Consulate in Paris (Ex B), embarking from France to the home of her mother in Montreal. After her marriage on December 16, 1933, plaintiff obtained a French passport (Ex I; P 2 of Ex. U; P 8 of Ex. T), which she used as her "travel document" in returning to France with her husband.

Thereafter, plaintiff was in possession, from time to time, of a French passport, which she always used, whenever traveling abroad, and an American passport, which she used when she wished to return to the United States.

This continued until December 19, 1944, on which date plaintiff was denied an American passport for which she had applied. (Ex. I).

In September, 1939, Germany and France were at war. The United States remained neutral. When France declared war in 1939, as a war time measure, everyone residing in France was required to obtain a *carte d' Identite*. Plaintiff obtained one as a French National. (P 2, Ex. U). On the application form to obtain the *carte d' Identite,* plaintiff could have claimed American citizenship, but did not do so, claiming French citizenship instead. Plaintiff became a member of the French Red Cross in 1939, prior to the time it was nationalized. She performed voluntary services as an Emergency Nurse, commencing in 1939. (P 2, Ex. U).

Plaintiff testified (Tr. Pp 303 et seq.)

"Q. (By Mr. Cunneen, of counsel for Defendant). Did you perform services in France for what you now call the International Red Cross? A. (Witness) Yes.

"Q. Did you work for the French Division of the International Red Cross? A. Yes.

\*    \*    \*    \*    \*    \*

"Q. And during the war, you were given a card of identity as a French National, were you not? A. I was given an identity card.

"Q. Describing you as French? A. As French, yes.

"Q. Who presented the card to you? A. The Prefect of Police of Sanlis, I think. I believe that it was in 1941, but that would be on the card.

\*    \*    \*    \*    \*    \*

"Q. And did you apply for a card of identity? A. Yes.

"Q. Did you fill out an application for such a card of identity? A. I do not remember exactly, but I must have.

"Q. Was there a place where you could claim to be an Austrian subject or a Hungarian subject? A. Yes, of course.

"Q. Or an American citizen? A. Of course.

\*    \*    \*    \*    \*    \*

"Q. In applying for a French passport, did you claim to be an American citizen? A. No.

"Q. In filling out your card of identity, did you claim to be an American citizen? A. No.

"Q. Do you recall any application or any document that you filled out for the French Government in which you claimed to be an American? A. No."

The German Army entered Paris, June 14, 1940. Following the liberation of France in 1944 and the return thereto of the American Embassy, Plaintiff appeared at the American Consulate in Paris on December 19, 1944. Plaintiff applied for registration (P 1, Ex. I) and an American passport. Plaintiff was denied an American passport "and it was at that time that they (the Vice Consul) told me (Plaintiff) that I was not an American citizen, which was the first time I had ever heard it mentioned" (Tr. Pp 65–66). Plaintiff left an affidavit in protest at the American Consulate in Paris. (Ex. I). In the meantime, the American Embassy in Paris had been furnished a photostatic copy of plaintiff's "Declaration" of December 12, 1933, by the French authorities, (Ex. 5, Ex. I) from

which the Embassy asserted that it had now discovered that plaintiff, in 1933, had voluntarily acquired French citizenship (Ex. 5).

Sometime after the war (probably in 1945) the French Government sought to reach the capital and income from plaintiff's American Trust, (P 18, Ex. T) and plaintiff and her husband were threatened with penalties if they did not answer certain questions propounded by the French Government.

The claim was made on behalf of plaintiff that the trust property in the United States was not subject to the wishes of the French authorities because she was an American citizen (Tr Pp 177–178). This controversy with the French Government was finally (in 1949) settled.

In 1946, plaintiff obtained a renewed French passport. Plaintiff and her husband visited the United States between June and November, 1946, she traveling on her French passport. While in the United States on that trip, plaintiff signed her U. S. Income Tax Returns for the years 1942, 1943, 1944 and 1945, (Tr. P 360), which had been prepared by the witness, Mr. Hassel, (Tr. P 359) on behalf of the Executors and Trustees of the Trust Estate. These returns were filed in the Collector's Office on October 28, 1946. In all the income tax returns prepared by Mr. Hassel, plaintiff was not held out as a nonresident alien tax payer. In the case of a nonresident alien, the tax on American income is higher. (Tr. Pp 367–370).

Sometime in September, 1947, plaintiff's uncle, Dr. E. C. Lobenstine, of his own accord and without plaintiff's knowledge at the time, after visiting the United States State Department, went to the French Consulate in New York, in order to see what had taken place in 1933. He asked for photostats of what had transacted that had a bearing on plaintiff's losing her American citizenship. (Tr. Pp 134–142). By letter, dated September 19, 1947, the French Consulate in New York, mailed three papers to Dr. E. C. Lobenstine (Ex. 9). These papers were a photostat of the certified copy of the Declaration of December 12, 1933, (Ex. 4); a photostat of a certified copy of a carbon of the letter of the French Consul General, of November 8, 1933 (Ex. 3) and a photostat of plaintiff's original letter (Ex. 2) to the French Consulate, of November 5, 1933.

Subsequently, Dr. Lobenstine made a second visit to the State Department and thereafter he inquired in New York whether the French Consulate at New York could annul the Declaration of December 12, 1933 (ab initio (Ex. 8).

On September 29, 1947, Dr. Lobenstine wrote the United States State Department that a French Consulate official stated that the Consulate itself had no such authority, but that the matter could be presented to the French Ministry of Public Health and Population, and he inquired whether the State Department would recognize plaintiff as American if the French Government annulled plaintiff's application for French citizenship, (Ex. 8).

By letter of November 18, 1947, the State Department advised (Ex. 5) "In the absence of a decision of a competent court in an analogous case, it is the view of the Department that if the appropriate French authorities should cancel ab initio the naturalization of Mrs. Boissonnas as a French citizen, she could properly be held not to have lost her American citizenship under the provisions of Section 2 of the Act of March 2, 1907".

Francois Monahan, a French lawyer in Paris retained by plaintiff's husband, on November 28, 1947 (Exs. 6 and 6A), requested the French Ministry of Public Health and Population to annul plaintiff's Declaration of December 12, 1933. The Ministry replying, (to Ex. 6) stated that the Declaration of December 12, 1933 was in "perfect regularity" but the matter of recovery of plaintiff's American Nationality might be referred to the American authorities. (Exs. 7 and AA).

The Ministry of Public Health and Population is an administrative governmental agency (Tr. 490–1) since the French liberation, in charge of nationality matters in France, (Tr. 738–739).

The archives of the Ministry of Justice Department of Naturalization have been

transferred to the Ministry of Public Health and Population (Tr. 739).

Plaintiff secured a new French passport in 1949 (Tr. 314). Traveling to the United States from France to attend the trial of this case, she was admitted on a Certificate of Identity (Tr. 316, 317 and 343) issued by the American Embassy in Paris.

Plaintiff has resided in France and made her home there ever since going to France immediately following her marriage. She was living in France with her husband and children, and had her home there when she came to the United States to testify at the trial of this case, intending to return to her home in France thereafter. (Tr. P 343).

Plaintiff herself has never claimed in any written document left with a French governmental official, to be an American citizen since she made her home in France with her husband (Tr. 308–310; Pp 1 and 2, Ex. U). However, she testified that "when anyone (in the community) asks me, I always say that I have dual nationality".

### III.

### Contentions of the Respective Parties

Certain facts are conceded. It is conceded that plaintiff was a minor, nineteen years of age, at the time she signed the Declaration of December 12, 1933, (Ex. 4); that at that time, due to her previous education, she could read and understand French; and that she has never taken any Oath of Allegiance to France or any other country or Sovereign. The claims of the respective parties may be epitomized from the statements of their counsel.

Judge Finch (of counsel for plaintiff) (Tr. P 16, et seq.) stated "So that is what you have; a mutual mistake of fact in signing this Declaration * * * it is a very common jurisdiction of equity to set aside a contract which was made under a mutual mistake of fact. That is what we are asking the court to do; to set aside this Declaration which admittedly in writing was signed under a mutual mistake of fact; * * * that is our case right in a nut shell". Plaintiff "executed a document which was done under a mutual mistake of fact and we ask that it be set aside and cancel it on the ground that it was executed under this mutual mistake of fact. * * * Now, then, that is just our case. The Attorney General says 'well, following this Declaration that she signed and the marriage that nationalized her as a French citizen'. We say that we do not know whether it naturalized her, but that has nothing to do with our case. We simply ask to set aside this Declaration; that is the basis of our claim, this Declaration. * * * If it should turn out that she was not naturalized in France, why that is another ground. That is another ground that she never lost her American citizenship".

Plaintiff further claims that she relied on the statements of the French Consul contained in his letter of November 8, 1933 (Exs. 3–3A) that "If you comply with the above as a consequence you will possess both French and American nationalities" and that she has always considered herself as having this dual nationality or possessing "both French and American nationalities;" that "no challenge was made of this by anyone until she applied for an American passport in Paris in December, 1944; that she was the more easily misled in her acceptance of this erroneous advice of the French Consul, because of the fact that her own mother possessed a dual citizenship, namely, both British and American, acquired by reason of her marriage to a Canadian National; that as Municipal law determines how citizenship may be acquired, the same person may possess a dual nationality Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320, Attorney General of U. S. v. Ricketts, 9 Cir., 165 F.2d 193; that because of her belief that she possessed both French and American citizenship an explanation is furnished for acts of hers which otherwise might be misunderstood; for example, the use of a French passport while traveling in Europe and her American passport when traveling to America; that being an infant when she executed the Declaration of December 12, 1933, she could not effectively renounce her citizenship then and did not do so at any subsequent time, Attorney Gen-

eral of U. S. v. Ricketts, 9 Cir., 165 F.2d 193; U. S. ex rel. Baglivo v. Day, D.C., 28 F.2d 44; that under the provisions of the Cable Act of 1942, 42 Stat. 1022, plaintiff could not have expatriated herself by marriage alone, that formal renunciation was essential and this she never did and that defendant failed to show that plaintiff has acquired French nationality under the French Nationality Law". This latter claim will be discussed later, under a separate heading.

Mr. Cunneen (Tr. Pp 30, et seq.) Assistant U. S. Attorney, (of counsel for Defendant) stated "This is not a case of Naturalization in which a woman is seeking to acquire American citizenship. * * * This is the story of a woman (American citizen) who voluntarily acquired French citizenship, removed to France and made her home there. Her home is in France. * * Plaintiff, at the age of 19, married a French citizen. She was familiar with the French language. After her engagement, in 1933, she wrote a letter to the French Consulate in which she said 'I understand also that by the new laws, I do not lose my American citizenship, but in any case, I plan to become French.' She was married in New York in December, 1933 and immediately thereafter, removed to France where her home has been ever since and now is. She used French passports in her travels. * * In 1944, the U. S. State Department discovered that plaintiff had voluntarily acquired French citizenship. That was brought to the attention of the American Embassy in Paris and they then advised plaintiff that she had lost her American citizenship. Plaintiff protested and filed an affidavit with the American Embassy at Paris, setting forth her ideas. * * * Plaintiff's counsel has suggested that this is a case of mutual mistake of fact. Usually in cases of mutual mistake of fact, the two parties who are mistaken are the parties to the suit. In this action apparently, the French Consulate, according to plaintiff's version, was mistaken and plaintiff herself was mistaken, but the French Consulate is not the party defendant in this case. It is the Secretary of State of the United States. * * * It was the fol-lowing (by plaintiff) of 'poor advice' not given, however, by the defendant in this case. * * * It is the contention of the State Department that if you ask for French citizenship, you are renouncing your American citizenship".

It is a further contention of defendant that the proof shows that plaintiff obtained French citizenship voluntarily; that she expressed her desire for French citizenship and planned to be French "in any case" (Ex. 2); that "plaintiff was not misled by anything that was stated in the French language because she herself was well versed in French, having studied it in schools both in this country and at the Sorbonne; that plaintiff did acquire French nationality under the French Nationality Law". This, too, will be discussed later in connection with plaintiff's claim in this respect.

## IV.

### Intent

It is agreed that the statement of the Consul General (Exs. 3 and 3A) to the effect that "if you comply with the above, as a consequence you will possess both the French and American nationalities" was erroneous.

Plaintiff says (Br. Pp 2 and 3) "This interpretation of the French Law was a mistake of fact, since foreign law is always a question of fact. Further, the French Consul's assurance to the plaintiff that her acquisition of French citizenship would not deprive her of her American citizenship and that she would thereby possess dual nationality, was a mistake both of fact and law as to the applicable American Law". This also is the view of defendant. In Exhibit 5, defendant states: "It is alleged that prior to making the application, Mrs. Boissonnas had been advised that she would not thereby lose her American citizenship but would, after her marriage, have a dual nationality status; that is, she would retain her American citizenship but, through her application and marriage to a French citizen, would acquire French citizenship. Obviously, this advice was erroneous in view of the provisions of Section 2 of the Act of March 2, 1907".

The same position is taken by the French Government (Exs. 7 and 7A).

Plaintiff testified (Tr. P 59) that she signed the Declaration of December 12, 1933 (Ex. 4) in reliance on the information furnished her by the French Consul General in his letter to her of November 8, 1933 (Ex. 3). She claims (Br. P 3) that she "relied upon these erroneous representations and assurances as to fact and law. These were the mistakes (so plaintiff states) under which she made the Declaration of December 12, 1933".

Plaintiff further submits that "expatriation is a voluntary renunciation of citizenship, the renouncing of allegiance to one's own country, usually by forsaking one's own country; that since expatriation is a matter of intent on the part of the party concerned, that intent must be shown by formal act and not by gathering such intent from indirection" and that "Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320, is the leading authority on the proposition that intent is essential to effect expatriation. Without such intent there can be no expatriation".

Defendant agrees that in certain cases intent does have a bearing on, and is a factor to be considered in determining the question of loss of American citizenship, but that under the facts of the instant case, this question is foreclosed as having been finally determined in Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287.

Plaintiff, on the other hand, urges that "the Savorgnan case furnishes no authority to deny relief to her; that in the Savorgnan case plaintiff was an adult at the time (she acted); that she took an oath of allegiance to the King of Italy and made a formal renunciation of her American citizenship," whereas "in the case at bar, plaintiff was a minor (at the time she acted) and that she never took any oath of allegiance, nor in any way formally renounced her American citizenship".

As heretofore stated, it is conceded that unlike the situation in the Savorgnan case, plaintiff here (at the time she acted) due to her previous education, could read and fully understand the French language.

In the Savorgnan case, plaintiff, an American born woman, married an Italian citizen. In an action for a judgment declaring that plaintiff is an American citizen, the District Court held that plaintiff was entitled to judgment declaring her to be an American citizen. Savorgnan v. U. S., D.C., 73 F.Supp. 109.

The Court of Appeals reversed the judgment of the District Court, 7 Cir., 171 F. 2d 155, at page 158, stating in its opinion that: " * * * when an American citizen voluntarily acts in a manner inconsistent with his American citizenship by becoming a naturalized citizen of another country, his expatriation results, regardless of his subjective intent. * * * Conceding that her motive was solely to obtain consent of the Italian government to her marriage and that she was misinformed as to the legal consequences of her conduct, the fact remains that she consciously and voluntarily applied for and obtained naturalization in a foreign state which, under the provisions of the statute, effected a loss of her American citizenship.

"The motive for her conduct is distinguishable from her intent to act as she did. Such motive has no bearing on the determination of this question. Nor is the fact that she was misinformed or mistaken as to the legal consequences of her conduct of any significance here. One cannot avoid the force of a statute by asserting a mistaken conclusion as to its sanctions or effects. If these factors were permitted consideration, the operation of the statute would depend not upon the voluntarily performed act of becoming naturalized in a foreign state, but upon the extent of the legal knowledge and the subjective intention or motivation of the person involved. Such tests cannot be used to determine the operation of the statute".

The judgment of the Court of Appeals was affirmed by the Supreme Court. Savorgnan v. U. S., 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287. At page 499 of 338 U.S., at page 296 of 70 S.Ct., the court say: "The petitioner's principal contention is that she did not intend to give up her American citizenship, although she applied for and accepted Italian citizenship, and that

her intent should prevail. However, the acts upon which the statutes expressly condition the consent of our Government to the expatriation of its citizens are stated objectively. There is no suggestion in the statutory language that the effect of the specified overt acts, when voluntarily done, is conditioned upon the undisclosed intent of the person doing them".

\*    \*    \*    \*    \*    \*

At page 500 of 338 U.S., at page 297 of 70 S.Ct. "There is nothing, however, in the Act of 1907 that implies a congressional intent that, after an American citizen has performed an overt act which spells expatriation under the wording of the statute, he, nevertheless, can preserve for himself a duality of citizenship by showing his intent or understanding to have been contrary to the usual legal consequences of such an act".

\*    \*    \*    \*    \*    \*

At page 502 of 338 U.S., at page 298 of 70 S.Ct. "She knew that the instruments related to her citizenship and that her signature of them was an important condition upon which her marriage depended. She thus was as responsible for understanding them as if they had been in English. On that basis, she was married. Whatever the legal consequences of those acts may be, she is bound by them".

The rule of law laid down in the Savorgnan case unquestionably governs and controls the instant case. By it, this Court is bound.

In view of the foregoing, a further consideration of the intent of plaintiff in the present case would be immaterial except for the fact that plaintiff premises her claim for the relief sought upon the ground of "mutual mistake". She asks that the Declaration of December 12, 1933, be set aside because she signed it "under a mutual mistake of fact" relying on the statements of the French Consul in his letter of November 8, 1933. The question of plaintiff's intent at the time of signing the Declaration, therefore, bears on her mental attitude and so enters into a determination of the question as to whether or not there was a "mutual mistake" in the first instance.

The Court must determine the intent of plaintiff herein immediately before and at the time of signing the Declaration of December 12, 1933 (Ex. 4) from the whole of the record. What was plaintiff's intent? Did she rely on the Consul General's statement?

On November 5, 1933, before signing the Declaration, plaintiff had written the French Consul General in New York, her letter (Ex. 2) wherein plaintiff declared "but *in any case* I plan to become French" and again in the same letter she had earlier stated "before my marriage I intend to declare my desire to become a French citizen".

At that time she "was very much in love" (Tr. P 193); she was engaged to and about to marry her fiancé, Remi Boissonnas, 25 years of age, a French banker (Ex. V). He, too, had been a persistent suitor. He came to America in the summer of 1933, a few months after plaintiff had met him "to meet my family". (Tr. Pp 42 and 92).

There was some discussion during the time of her engagement until her marriage regarding "the effect of my marriage on my American citizenship", (Tr. P 96) but the interest in these discussions and the concern manifested regarding plaintiff's citizenship was principally on the part of plaintiff's relatives and her future husband.

Her mother, Mrs. Aylmer, with whom plaintiff was in constant touch, testified: (Tr. P 193): "The Court: Was it your understanding that your daughter would not have married this gentleman if by reason thereof, she would have lost her American citizenship? A. (Witness) Oh, never. We didn't discuss that side of it at all because we felt that she would not lose her citizenship. \* \* \* My daughter was very much in love \* \* \* and we were all—the older people were helping her to guard this thing \* \* \*".

The question of whether plaintiff would go through with the marriage if it meant losing her citizenship was, it seems, never even discussed.

On October 17, 1933 (prior to the receipt by her of the Consul General's letter of November 8, 1933 (Ex. 3) plaintiff signed

an affidavit (Ex. E) in which she states that she is a citizen of the United States, but that she is "departing for France during the latter part of December, 1933;" and that she "intends to take a permanent residence in Paris, France, and intends to forward to Paris, France, previous to her departure, as part of her household equipment" certain articles of furniture, silverware, linens, etc; "that she is to be married on or about the sixteenth day of December, 1933 to Monsieur Remi Boissonnas, a citizen of. France, previous to her departure and that she intends that the gifts received by her on her wedding will be shipped to France subsequent to her departure". (Tr. P 381). This affidavit was prepared for plaintiff at her request, at the office of Messrs. White & Case, attorneys-at-law, in New York City. (Ex. C).

Considered with the affidavit (Ex. E) the language used in Exhibit 2 seems unequivocal. "Before my marriage I intend to declare my desire to become a French citizen * * * but *in any case* I plan to become French". This language has an unmistakable meaning. It is very simple and means just what it says.

Plaintiff evidenced some difficulty in explaining the use of this language. Plaintiff declared at first that (Tr. P 104).

"Q. (By Mr. Cunneen) Can you tell me why you said 'but in any case I plan to become French'? A. No, I just—.

"Q. Can you tell me why you said that 'In any case I plan to become French?' A. 'I am pretty sure what I meant was that if I could—it was always the same thing—if I could become French my family-in-law would appreciate that gesture', and at (Tr. P 214) 'and I only did that as a sort of gesture to my family-in-law, thinking it would have no effect on my American citizenship. I had been assured that it would have no effect and that is why I did it.'

"Q. You chose freely to acquire a French nationality though, did you not? A. I told you I did it as a gesture of friendship, if you will, towards my in-laws".

    *     *     *     *     *     *

At Tr. P 105, plaintiff testified: "Q. (By Mr. Cunneen) And in any case you planned to become French, is that correct? I don't think—that sentence doesn't seem to mean anything to me. That sentence, it doesn't make sense because my first concern—I say by the new laws that I won't lose my American citizenship".

At Tr. P 107 plaintiff testified: "Q. (By Mr. Cunneen) If your desire to become French was conditional, why did you say 'in any case I plan to become French'? A. I have no idea.

"Q. You have no idea? A. I don't think that sentence is English".

The Declaration (Ex. 4) states at the beginning "Declaration in order to claim the French Nationality of the husband".

The original of Exhibit 4 was in French. Plaintiff, however, read and understood French and knew exactly what she was signing.

It seems apparent plaintiff did not, in 1933, rely on the French Consul's statement regarding dual citizenship, but that she intended at the time of signing the Declaration, to acquire French citizenship and thereby voluntarily to expatriate herself.

No doubt she was (and all others interested were) happy to learn the French Consul's views, as stated in his letter and as plaintiff testified (Tr. P 55) she then thought that "her troubles were over". But that was not what persuaded her. She intended to acquire French citizenship, come what may, and having evidenced her intent, she signed the Declaration, followed its terms, and was married to a French National and citizen, four days thereafter, whereby she became naturalized as a French citizen as fully as if she had taken an Oath of Allegiance. She "performed an overt act which spells expatriation under the wording of the statute". Savorgnan v. U. S., 338 U.S. 491, 500, 70 S.Ct. 292, 297, 94 L.Ed. 287. Here, however, differing in that respect from the Savorgnan case, plaintiff's intent was fully and plainly expressed.

The view that plaintiff on December 12, 1933, intended to acquire French citizenship regardless of whether or not she also retained her American citizenship, and that in signing the Declaration (Ex. 4) she did not rely on the statement of the French Consul General in his letter (Ex. 3) is strengthened by two very significant facts as disclosed by the evidence.

Although at the time plaintiff received the letter of November 8, 1933, (Ex. 3) from the Consul General, she and her mother were staying together at the home of plaintiff's aunt, Mrs. Locke, in Montreal, Canada, (Tr. P 191, Ex. T. P 6) her mother never saw the original of Exhibit 2 (Tr. P 191) and was not informed by plaintiff, and did not know of the receipt of Exhibit 3 by plaintiff, or of plaintiff's claim that on December 12, 1933, she signed the Declaration in reliance thereon. Plaintiff's mother testified (Tr. Pp 191 and 199) as follows:

"Q. (By Cunneen) I show you plaintiff's Exhibit 2, a letter, dated November 5, 1933, and ask you whether you have ever seen the original of that letter. A. Never. * * *

"Q. Then do you know whether your daughter received a letter from the Consulate in answer to this letter? (Ex. 2). A. No, I don't.

"Q. You did not happen to know that? A. No.

"Q. Did you know whether she signed the Declaration because of the receipt of the letter from the Consul? Did you know anything about that? A. No, nothing".

And finally plaintiff herself had forgotten all about her letter of November 5, 1933 (Ex. 2) to the Consul General of New York, and his reply thereto, of November 8, 1933 (Ex. 3) until she saw copies of them, after 1944. (Ex. T. P 6).

The significance of the foregoing lies in the fact that at no time from December 19, 1944, when an American passport was denied her in Paris, did plaintiff or anyone in her behalf claim that plaintiff had been misled by the French Consulate in 1933 regarding "dual nationality" until her uncle, Dr. Lobenstine, voluntarily, and of his own accord, visited the Consulate in New York in September, 1947, at which time he obtained from the Consulate, photostats of the documents there on file, including Exhibits 2 and 3, copies of which he later sent to plaintiff and her husband, who were then in Paris, before November 28, 1947 (Ex. 6A, P 6, Ex. T).

It may well be that plaintiff, by and at the time she testified at the trial (on November 14, 1949) may have convinced herself that when she signed Exhibit 4, she did so relying on the information contained in the letter of November 8, 1933, from the Consul General (Ex. 3), but she had no recollection of that letter.

On November 7, 1949, plaintiff testified in a deposition as follows: (Ex. T) "Q. (By Mr. Cunneen) Do you have a recollection of a written letter from the French Consulate in the early part of November, 1933, dealing with the matter of your possible French citizenship and your American citizenship? A. I have seen copies of a letter.

"Q. Do you have any recollection? A. Recollection and fact are being confused in my mind because I have seen a copy of the letter, but I don't know whether I recollect it or not. Now I do not know whether I recollect it or whether my knowledge of the letter is because I have seen copies".

■ From a consideration of all the evidence, the court is clearly of the opinion and so finds that plaintiff at the time of signing the Declaration (Ex. 4) intended to, and did, knowingly and purposely choose and claim the French Nationality and Citizenship and that in so doing, she did not rely on the statement of the French Consul General in his letter of November 8, 1933 (Ex. 3) to the effect that "If you comply with the above as a consequence you will possess both of the French and American Nationalities".

## V.

### Mutual Mistake

■ In view of its ruling on the question of "intent", the Court holds there was no "mutual mistake" made in this case. There

may have been a "mistake" made by the French Consul General in the information he gave plaintiff in his letter of November 8, 1933 (Ex. 3), but plaintiff, as just above set forth, did not rely on this "mistaken" information. There was no "mistake" upon her part when she signed the original of the Declaration (Ex. 4).

In addition to the foregoing, there was no "mutual mistake" as between the parties to this action. The defendant here is in effect the Department of State of the United States, through its Secretary. Plaintiff does not claim, either in the pleadings or at the trial, to have received any information from the United States State Department or any United States Government official with regard to her claimed "dual citizenship" prior to the time (or any time thereafter) she signed the Declaration of December 12, 1933. (Ex. 4).

The doctrine of "mutual mistake" has no application in this case. It is to set aside the Declaration of December 12, 1933 (Ex. 4) which plaintiff claims "was signed under a mutual mistake of fact" that her counsel states to be "our case in a nut shell".

The court is of the opinion and so finds, that it cannot, and it does not, set aside and cancel the Declaration of December 12, 1933, upon the ground that it was executed under a "mutual mistake of fact" or upon any other ground.

Plaintiff submits that the recent decision (April 9, 1951) of the Supreme Court in the case of Moser v. U. S., 341 U.S. 41, 71 S.Ct. 553 "is conclusive in supporting our contention that the Declaration of December 12, 1933 was given on indisputable evidence so as to negative any intention on the part of the petitioner to renounce her American citizenship; * * * that not only did the plaintiff not have any intention of renouncing her American citizenship, but that she was advised in writing by the French Consul General that she would not lose such citizenship".

The decision in the Moser case, however, is not controlling here. Upon the facts presented in each case, they are readily distinguishable in many respects. However, only two need be here pointed out

as evidencing the distinction, in part at least. (1) In the Moser case, 341 U.S. at page 47, 71 S.Ct. at page 556, the Supreme Court say: "Petitioner did not knowingly and intentionally waive his rights to citizenship".

In the instant case, for the reasons already stated, the Court has just held that plaintiff "did knowingly and purposely choose and claim" French citizenship and that she did not rely on the statements of the French Consul General. (2) In the Moser case, the United States State Department itself was responsible for the erroneous advice there given petitioner.

In its decision Petition of Moser, 85 F.Supp. 683 at pages 684–685, later affirmed by the Supreme Court, the District Court, say: "The Swiss Legation then took the matter up with the State Department * * *. Accordingly, through correspondence with the selective service authorities, the American State Department expressed the view that the filing of a claim for exemption from military service by nondeclarant friendly aliens like Moser should not operate as a waiver for forfeiture of naturalization rights * . * *. Nothing could be clearer than the fact that our own State Department recognized the immunity that Moser had under the treaty * * *. And so, assuming that the State Department made an egregious error * * * I cannot see how that can be translated into a waiver by Moser".

Referring to this feature of the case, the Supreme Court, 341 U.S. at page 46, 71 S.Ct. at page 556, say: "In response to the claims of petitioner and others, and in apparent acquiescence, our Department of State had arranged for a revised procedure in claiming exemption. The express waiver of citizenship had been deleted. Petitioner had sought information and guidance from the highest authority to which he could turn, and was advised to sign Revised Form 301".

Whatever information or advice plaintiff in the instant case received was from the French Consul General and as already stated (and admitted) she received no information or advice from the United States.

Department of State (defendant herein) nor from any other official of the United States. Neither the State Department nor any other United States Government official was consulted about, or in any way involved, with respect to the information and advice which plaintiff claims she received either before or subsequent to the signing by her of the original Declaration (Ex. 4).

## VI.

### Ratification

Plaintiff contends that as she was a minor, nineteen years of age on December 12, 1933, when she signed the "Declaration" (Ex. 4) she was at that time legally incapable of expatriating herself and that the act of signing the "Declaration" followed by her marriage on December 16, 1933, did not constitute an act of expatriation. U. S. ex rel. Baglivo v. Day, D.C., 28 F.2d 44".

Defendant, on the other hand, maintains that the acts of plaintiff, at the age of nineteen, were not a mere nullity; that at most they were voidable, but not void; that at nineteen she was "naturalized in a foreign state" even if the expatriated effect of such naturalization might have been voided by her either before, or with reasonable promptness after, reaching her majority, but that neither before nor after reaching her majority, did she take any such steps; that on the contrary, in 1939, after war was declared, and while the United States was neutral, and after plaintiff had reached her majority, she chose and showed her preference for French citizenship by joining the French Red Cross and obtaining an Identity Card from the French Government describing herself as French (P 2 Ex. U); that after December 19, 1944, (when an American passport was denied her) plaintiff did nothing to elect to have American citizenship as her single nationality; quite the reverse in fact as stated by the American Vice Consul in the "Opinion" dated December 28, 1944 (Ex. I), as follows: "Although the applicant was a minor at the time she signed the Declaration with a view to claiming French nationality, through her husband, she failed to disaffirm French Nationality when she became twenty-one years of age, and continued to use French passports".

Plaintiff urges also that her domicile in France should not be considered as evidence of an election or of an attempt to elect French citizenship as opposed to her claim to American citizenship, "as the woman takes the domicile of her husband by operation of law".

Defendant submits that as early as October, 1933, however, plaintiff stated her intent to take up a permanent residence in France (Ex. E); that after formally applying for and obtaining French citizenship in conformity with French law, immediately upon her marriage, she moved to France and ever since has made her home and domicile there; that in December, 1939, after mentioning her French marriage, plaintiff declared (Ex. Q) "my home is here for that reason and it is impossible for me to return to the United States to reside at the present time, as I have my home here to maintain"; that on December 19, 1944, plaintiff was advised that the acquisition of French nationality meant the loss of American nationality, but that she still continued to maintain her domicile in France and that her acts after December 19, 1944, including her domicile in France continuously, clearly show that since that date she has done nothing to elect American citizenship as opposed to French and that at least from that date, to-wit, December 19, 1944, plaintiff having long since reached her majority, fully ratified her act of December 12, 1933 in signing the Declaration (Ex. 4) thereby seeking and obtaining French citizenship, which she was determined to have "in any case"; that while plaintiff did not take a formal "Oath of Allegiance" nevertheless, an expressed Oath of Allegiance cannot be regarded as of the essence of citizenship and that a person may be "naturalized in a foreign state" without taking or signing an expressed Oath of Allegiance if the laws of the foreign state for nationality are otherwise complied with.

█ The Court is of the opinion and so finds that plaintiff, at nineteen years of age, complied with all the necessary steps in or-

der to acquire and have French citizenship and that as of that time she became naturalized in France; that what she did at that time was not a nullity; that at most it may have been voidable but it was not void and that after reaching her majority and ever since, she has, by her conduct and every act, affirmatively ratified the acts and steps taken by her while she was a minor, nineteen years of age.

## VII.

### Applicable French Law

Plaintiff further asserts that defendant failed to show that plaintiff has acquired French Nationality under the French Nationality Law of August 10, 1927 and the Decree of the same date, both of which were in effect at the time of plaintiff's Declaration of December 12, 1933 and on the date of her marriage on December 16, 1933; that it is provided by Article V of that law that "any Declaration signed either with a view to acquiring or casting off the French citizenship * * * unless recorded at the Ministry of Justice, the declaration shall be regarded as null and void;" and further that "after recording, it must be published in the Bulletin of Laws" (this requirement of publication, however, may be waived by the declarant); that defendant failed to show a recordation or publication of plaintiff's Declaration of December 12, 1933 and that defendant's failure to offer proof of compliance with the requirements of Article V of the French Naturalization Law of 1927 is fatal to this branch of defendant's case. This claim is made independently of the other grounds upon which plaintiff seeks relief.

Article V reads as follows: "Any declaration signed, either with a view to acquiring or casting off the French citizenship, shall be received by the Justice of the Peace of the canton in which the declarant has his domicile, or, if there be none, his residence. In the case of residence abroad, it is signed before the diplomatic and consular officers. Unless recorded at the Ministry of Justice, the declaration shall be regarded as null and void. After recording, it must be published in the Bulle-

tin of Laws. Should, however, this formality be omitted, it may not work to the injury of the rights of the declarant. The recording is denied when the declarant does not meet the conditions required by the law. The denial and the grounds therefor are, within three months from the date of the declaration, to be notified to the declarant, who has a right to appeal to the civil courts in accordance with Articles 855 et seq. of the Code of Civil Procedure. Failing such notice, and when the above-mentioned time limit expires, the Minister of Justice must, unless he questions the declaration on the ground of unworthiness, deliver to the declarant, on his application, a copy of his declaration bearing the mention that it has been recorded. The declaration, after it has been duly recorded, works its effect from the day on which it was signed." (P 247 of Ex. HH).

Defendant contends that plaintiff acquired French citizenship under Articles 8 and 10 of the Decree of August 10, 1927 (to be quoted later in the Findings of Fact) and that Article V of the Law of August 10, 1927, has no application here; that Article V of the Law of August 10, 1927, specifies that the Declaration signed "with a view either to acquiring or casting off the French citizenship" (1) is delivered to the Justice of Peace by the declarant, or if abroad, to the diplomatic or consular officer; (2) it must be recorded at the Ministry of Justice, or if recording is denied, applicant must be advised of the denial and the grounds; (3) if recorded, it is preferably published in the Bulletin of Laws; (4) after recordation (a) the declarant may receive a copy of his application which is marked "recorded" and (b) the declaration works its effect from the day on which it was signed; that Article 8 of the Decree, however, deals with a foreign woman marrying a Frenchman in France who exercises her option under Article VIII of the law; that Article 10 of the Decree dealing with a foreign woman marrying a Frenchman away from France is similar to and parallels Article 8 of the Decree; that since the Declaration of Intention is signed abroad, there are two differences: (a) it is signed before the

French official who represents the Vital Statistics Bureau abroad, the Consular or diplomatic agent, and (b) it is signed in triplicate instead of duplicate, so that the third copy of the Declaration of Intention may be retained in the archives of the diplomatic or consular office; that the first significant difference between the Declaration of Nationality under Article V of the Law and the Declaration of Intention under Articles 8 and 10 of the Decree is that the Declaration of Nationality is executed before the Justice of Peace or his representative abroad, whereas the Declaration of Intention is executed before the Officer of Vital Statistics or his representative abroad; that the Officer of Vital Statistics has a function entirely different from the Justice of Peace (Tr. P 732). He is the only person with the authority to celebrate marriages (Tr. P 731); that the Declaration of the foreign woman requesting the French nationality of her spouse is made to him in France (Article 8 of the Decree) or, if abroad, to the Consular Officer as representative of the Vital Statistics Bureau;

(The Declaration (Ex. 4) of plaintiff herein reads in part as follows: "On the 12th day of December, 1933, before me, Rene Tanquerey, Vice Consul in Charge of the Consulate General of France at New York, *Officer of Vital Statistics Bureau * *"*) and finally that the Declaration of Intention under Articles 8 and 10 of the Decree works its effect only upon marriage, whereas the Declaration of Nationality under Article V of the law, if recorded, works its effect from the day it was signed.

Plaintiff urges further that when she furnished proof of her birth in this country (Ex. 1) and of the refusal of the Department of State to recognize her citizenship, the burden then fell upon the defendant to prove that the plaintiff had expatriated herself; that "the surrender of so valuable a right as one's citizenship must rest upon clear and unequivocal acts which either directly accomplish that result or by reason of their nature compel a presumption which, if not overcome, will have the same effect. Bauer v. Clark, 7 Cir., 161 F. 2d 397, 401;" that defendant has not in

any respect sustained the burden placed upon him and particularly has failed in the respect that he offered no affirmative proof of compliance by the French Officials with the requirements of the French Nationality Law and the Decree of August 10, 1927, under which defendant claims plaintiff acquired French citizenship.

But as defendant points out, there is a presumption of the regularity of the official acts of public officers. In U. S. v. Chemical Foundation, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131, the Supreme Court say: "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties".

This presumption of official regularity applies to the acts of foreign officials as well as American. "It is inconsistent with the comity due to the officers of a foreign government to impute to them fraud * * * where their conduct has not been questioned by the authority under which they were acting and to which they were responsible * * * and as regards the interest of others the acts of the officer in the line of his duty will *prima facie* be considered as performed honestly and in good faith". U. S. v. King, 3 How. 773, 44 U.S. 773, 785–786, 11 L.Ed. 824.

"It is presumed that public officials act correctly in accordance with the law and their instructions until the contrary appears." Sabin v. U. S., 44 F.2d 70, 76, 70 Ct.Cl. 574. No evidence was offered by plaintiff to overcome this legal presumption.

In addition to the presumption of law, the record further shows that (as hereinbefore stated) when in November, 1947, the French lawyer, Francis Monahan, (at the request of Remi Boissonnas, plaintiff's husband) sought an annullment of plaintiff's Declaration at the Ministry of Public Health and Population, the official reply from the Ministry indicated the "perfect regularity" (Ex. AA) of the Declaration as originally made. This, in itself, establishes the fact that the original "Decla-

ration" or a copy thereof, must have been, as required by law, filed with the proper French officials.

The Court is of the opinion and so finds that defendant has, where necessary, sustained in all respects the burden of proof required of him and has established by the weight of the evidence that plaintiff acquired French citizenship under Articles 8 and 10 of the Decree of August 10, 1927.

Upon a consideration of the whole of the record; the briefs and arguments of counsel and the applicable law, the Court has arrived at the following:

## Findings of Fact

1. This is an action for a declaratory judgment determining and declaring that the Plaintiff is, and always has been, a national and citizen of the United States.

2. Plaintiff is a native born American citizen. She was born in New York City on June 4, 1914, the daughter of Dr. Ralph Waldo Lobenstine and his wife, Anne Munroe Williams Lobenstine, both of whom in turn, were themselves native born American citizens. Dr. Lobenstine was born in Kansas; his wife in Syracuse, N. Y. Plaintiff has one brother, also a native born American citizen.

3. Defendant Dean G. Acheson is the Secretary of State of the United States and as such is charged with the administrative responsibility, among others, of determining United States citizenship status in the first instance and has jurisdiction with respect to the issuance of passports to citizens of the United States which he exercises through the Passport Division of the Department of State. By stipulation and order filed July 1, 1949, Dean G. Acheson was substituted as defendant herein for George C. Marshall, his predecessor, as Secretary of State of the United States.

4. Plaintiff's father died on March 21, 1931. During his life, and at the time of his death, he was a man of some means. At the time of her father's death, plaintiff was a minor. Her aunt, Miss Belle Lobenstine and Mr. Henry Forster, both residents of New York City, were appointed executors and trustees of the estate of plaintiff's father.

5. Under her father's will, plaintiff was to receive the income from approximately one-half of the trust estate and to receive the principal thereof, one-half at the age of thirty and the other half at the age of thirty-five.

6. Sometime prior to October, 1922, plaintiff's father and mother were divorced. In October, 1922, her mother married Henry Aylmer, a Canadian. Thereafter her mother made her home in Montreal, Canada.

7. During her earlier years, plaintiff attended school in the United States. She graduated from Miss Shipley's School, Bryn Mawr, Pennsylvania, in 1931, having spent seven years there. From Miss Shipley's School she went to Vassar, where she remained for one year. After that she went to France to the Sorbonne. During these years she had studied French and attended courses in French at the Sorbonne. She arrived in France in 1932 at the beginning of the school year and while there, she met her future (and present) husband, Remi Boissonnas. They became engaged and were married in New York City on December 16, 1933.

8. Remi Boissonnas is a French National and citizen. He was born in Paris, France, on May 7, 1908, the son of Jean Baptiste Boissonnas and his wife Genevieve Mirabaud Boissonnas. At the time of his marriage to plaintiff on December 16, 1933, he was a banker and was continuing as such at the time of the trial of this cause.

9. On December 16, 1933, just before their marriage, plaintiff and Remi Boissonnas signed a "Marriage Contract" (Ex. V) before the Consular Officer in charge of the French Consulate General in New York, under the terms of which plaintiff became entitled to separate ownership of all her own property.

10. Plaintiff desired, if possible, to have a civil marriage at the office of the French Consulate in New York. On October 30, 1933, plaintiff was in Montreal with her

mother. On that date, plaintiff inquired by letter of the French Consulate in New York whether a civil marriage before a French Consulate officer could be arranged. By letter, dated November 2, 1933, a reply was sent to plaintiff from the French Consulate, suggesting some difficulties.

11. On November 5, 1933, plaintiff again wrote to the French Consulate in New York (Ex. 2) as follows: "November 5th, Dear Sir, I just received your letter of the second concerning my marriage to Monsieur Remi Boissonnas. Before my marriage, I intend to declare my desire to become a french citizen. If I do this, is a civil marriage still impossible? I understand also that, by the new laws, I do not lose my american citizenship, but in any case, I plan to become french. Will you again be good enough to let me know about this? Monsieur Boissonnas is very anxious to know. I am very sorry to bother you. Sincerely yours, (Miss) Mary Louise Lobenstine. c/o Mrs. H. G. Locke, 1456 Crescent St., Montreal, Canada".

12. In response to her letter quoted in Finding No. 11, plaintiff received a reply from the Consul General for France in New York, dated November 8, 1933, (Exs. 3 and 3A) in which he states: "November 8th, 1933. Dear Madam: I am pleased to give you hereunder the supplementary information you have requested from me. The French Law in the case of a marriage between a person of foreign birth and a French citizen prescribes the following (I quote from the decree of August 10th, 1927, Art. 10): 'When the foreign woman who marries a Frenchman outside of France does not necessarily acquire the nationality of her husband through her marriage and intends to claim the French nationality, pursuant to article 8 of the law of August 10th, 1927, she must file a declaration to such effect with a French diplomatic or consular agent, before the marriage is performed.' 'The interested party must submit, together with her birth certificate, the certificate of law provided by article 9 of the decree of August 10th, 1927. The declaration is made in triplicate; one copy is filed with the records of the Embassy, Legation or Consulate where the act has been executed; the second copy is given to the interested party, and the third copy is addressed to the Chancellery, together with an exemplified copy of the marriage certificate.' It does not follow that if you sign the aforesaid 'declaration', a civil marriage will be possible at the Consulate, as it is a declaration of intention which becomes effective when the marriage has been celebrated and makes you acquire the French citizenship immediately upon completion of the marriage ceremony. The Certificate de Coutume (Certificate of Law) above mentioned is delivered by a duly recognized American Attorney or Counsellor at Law, either a resident in Paris or a local one. This document to confirm the provision of the 'Cable Act' U. S. Federal Law September 22nd, 1922, [§] Art. 3 [42 Stat. 1022]: 'An American woman shall not cease to be an American as a result of her marriage, after the adoption of the present law, unless she expressly renounces her nationality before a tribunal having jurisdiction in matters of naturalizations of aliens. With this exception, any American woman who will marry a foreigner not susceptible to become a citizen of the United States shall cease to be an American.' If you comply with the above, as a consequence you will possess both the French and american nationalities./. Respectfully yours, *Consul General for France."

13. After the receipt by her, of the letter referred to in Finding No. 12, from the Consul General, plaintiff did, on December 12, 1933, at the office of the Consulate General of France at New York, sign a document entitled "Declaration"—(Exs. 4, 4A and Y4)—with which she submitted the documents required in Paragraph 4 of the letter referred to in Finding No. 12, from the Consul General.

14. The "Declaration" referred to in Finding No. 13, was all in French. As shown by Exs. 4A and Y4 (translations) it reads as follows: "Consulate General of France at New York, 610 Fifth Avenue, New York, Declaration: In order to claim the French nationality of the husband (Application of article 8, 1st paragraph of the Law, and of articles 8 and 10

of the regulations). On the 12th day of December, 1933, before me Rene Tanquery, Vice Consul in charge of the Consulate General of France at New York, Officer of the Vital Statistics Bureau, appeared Miss Mary Louise Lobenstine, born in New York, United States of America, on the 4th day of June, 1914, who declared that she was about to marry Mr. Remi Boissonnas, of French nationality, and that she intended to claim expressly said nationality. In support of her declaration, the interested party submitted: 1. Her birth certificate. 2. A certificate of law establishing that according to her status she will not necessarily acquire the nationality of her husband as a result of her marriage. Said documents, together with the marriage certificate which will be delivered later, shall be annexed to the copy addressed to the Chancellery and shall all be filed together with the present document, in the archives of the Ministry of Justice. After reading the foregoing, the party hereto signed with me, Vice Consul in Charge of the Consulate, Officer of the Vital Statistics Bureau. (Signed) Mary Louise Lobenstine (Signed) R. Tanquerey, Vice Consul in Charge of Consulate General."

15. Before signing the "Declaration" (Ex. 4) plaintiff read it (as stated in the Declaration itself) and because of her previous education and study in and of the French language both in America and in France, she thoroughly understood its contents and meaning.

16. Plaintiff did not have a "Civil marriage" at the French Consulate. Instead, the marriage took place at Union Theological Seminary (on December 16, 1933) in New York.

17. After her marriage on December 16, 1933, plaintiff obtained a French passport which she used as her "travel document" in returning to France, shortly before Christmas in 1933, with her husband.

18. Plaintiff has resided in France and made her home there ever since going to France immediately after her marriage. She was living in France with her husband and children at her home there, when she came to the United States to testify at the trial of this case, intending to return to her home in France thereafter.

19. Plaintiff herself has never claimed in any written document left with a French governmental official, to be an American citizen.

20. When plaintiff came to the United States from France to attend the trial of this case, she was admitted on a Certificate of Identity issued by the American Embassy in Paris.

21. In September, 1939, Germany and France were at war. The United States remained neutral. When France declared war in 1939, as a war time measure, everyone residing in France was required to obtain a carte d' Identite. Plaintiff obtained one as a French National (P 2 Ex. U). On the application form to obtain the carte d' Identite, plaintiff could have claimed American citizenship, but did not do so, claiming French citizenship instead. Plaintiff became a member of the French Red Cross in 1939, prior to the time it was nationalized. She performed voluntary services as an emergency nurse, commencing in 1939.

22. Throughout the years plaintiff had applied for and there had been issued to her both American and French passports as follows: Between 1925 and the time of her graduation from Miss Shipley's School, plaintiff spent two summers in Europe. In 1925, she obtained an American passport (Ex. A). In 1929, she obtained a new American passport to visit France, England and other countries in Europe. (Ex. T, P 2). In 1932, while at the home of her mother in Montreal, she applied to the American Vice Consul at Montreal, Canada, for renewal of her 1929 American passport (Ex. A.). Her 1929 American passport was revalidated and she embarked for France to enter upon her studies at the Sorbonne. On June 1, 1933, she was issued a new American passport at the American Consulate at Paris, (Ex. B) embarking from France to the home of her mother in Montreal. After her marriage on December 16, 1933, plaintiff obtained a French passport (Ex. I; P 2 of Ex. U; P 8 of Ex. T), which she used as her "travel document" in returning to France

with her husband. In the summer of 1935, plaintiff traveled through the countries of Switzerland, Italy, Czechoslovakia, Greece, Turkey and Bulgaria on a French passport (Pp 10–11, Ex. T). Plaintiff obtained a renewal of her French passport around December, 1935, (P 9, Ex. T) as the original was not good for more than two years. (P 10, Ex. T). On June 5, 1936, plaintiff appeared at the American Consulate to obtain an American visa on her French passport (P 11, Ex. T, P 1, Ex. U). Plaintiff was desirous of coming to the United States. On her visit on June 5, 1936, she showed her French passport to the American Consular Officer. She was told that American citizens must travel to the United States on American passports. On June 5, 1936, plaintiff's American passport was amended by the American Embassy in Paris to show her marriage (Ex. L). Her American passport was thereupon changed to show her married name on June 5, 1936, (Ex. M) and thereupon her American passport was renewed. (Ex. M). Plaintiff traveled to America, using her American passport as renewed. At the same time (June 5, 1936) she reported the birth of her son, Jean, (Ex. N), born January 16, 1935. After June 5, 1936, plaintiff and her husband visited the United States, plaintiff using her American passport (Ex. I). In returning from the United States to France, plaintiff again used her French passport. In September, 1938, plaintiff resided in Paris, registering at the American Consulate in Paris (Ex. O), and had a new American passport issued to her (Ex. K). On page 1 of the passport application she declared she had not been naturalized as a citizen or subject of any foreign state (Ex. K). Plaintiff's 1938 American passport was revalidated in 1938, (Ex. Q). Plaintiff's American passport was again revalidated by the American Consulate in Paris on August 12, 1940 (Ex. R). On November 5, 1940, she registered at the American Consulate (Ex. P). On March 28, 1941, she was issued at the American Consulate in Paris, a replacement passport which was limited to October 1, 1941 (Ex. J). In 1946 plaintiff obtained a renewed French passport upon her signed application. Returning to France, plaintiff again obtained a French passport in 1947, on her signed application. She traveled to Switzerland on this French passport around September, 1947. Plaintiff secured a new French passport in 1949.

23. The German Army entered Paris June 14, 1940. Following the liberation of France in 1944 and the return thereto of the American Embassy, plaintiff appeared at the American Consulate in Paris on December 19, 1944. Plaintiff applied for registration (P 1, Ex. I) and an American passport. Plaintiff was denied an American passport as in the meantime the American Embassy in Paris had been furnished a photostatic copy of plaintiff's Declaration of December 12, 1933 (Ex. 5 and Ex. I–1) from which the Embassy asserted it had now discovered that plaintiff in 1933 had voluntarily acquired French citizenship (Ex. 5). Plaintiff left an affidavit in protest at the American Consulate in Paris (Ex. I).

24. Sometime after the war (probably in 1945) the French Government sought to reach the capital and income from plaintiff's American Trust and plaintiff and her husband were threatened with penalties if they did not answer certain questions propounded by the French Government. The claim was made on behalf of plaintiff that the trust property in the United States was not subject to the wishes of the French authorities because she was an American citizen. After numerous delays this controversy with the French Government was, in 1949, finally settled, both on behalf of plaintiff and her husband as well. Plaintiff did not know and the record does not show the terms of the settlement but plaintiff had to "bring money over from America to France" both "for me and for my husband".

25. Plaintiff and her husband visited the United States between June and November, 1946. She traveled on her French passport. While in the United States on that trip, plaintiff signed her United States Income Tax Returns for the years 1942,

1943, 1944 and 1945, which had been prepared by the witness, Mr. Hassel, on behalf of the Executors and Trustees of the Trust Estate. These returns were filed in the Collector's Office on October 28, 1946. In all the income tax returns prepared by Mr. Hassel, plaintiff was not held out as a non-resident alien tax payer. In the case of a non-resident alien, the tax on American income is higher.

26. Sometime in September, 1947, plaintiff's uncle, Dr. E. C. Lobenstine, of his own accord, and without plaintiff's knowledge at the time, after visiting the United States State Department, went to the French Consulate in New York in order to see what had taken place in 1933. He asked for photostats of what had been transacted that had a bearing on plaintiff's losing her American citizenship. By letter, dated September 19, 1947, the French Consulate in New York, mailed three papers to Dr. E. C. Lobenstine. These papers were a photostat of a certified copy of the Declaration of December 12, 1933 (Ex. 4); a photostat of a certified copy of a carbon of the letter of the French Consul General of November 8, 1933 (Ex. 3) and a photostat of plaintiff's original letter (Ex. 2) to the French Consul, of November 5, 1933. These documents were later (but before November 28, 1947) sent by Dr. Lobenstine to plaintiff or her husband in Paris, France.

27. Subsequently, Dr. Lobenstine made a second visit to the State Department and thereafter he inquired in New York whether the French Consulate at New York could annul the Declaration of December 12, 1933 ab initio (Ex. 8). On September 29, 1947, Dr. Lobenstine wrote the United States State Department, after a French Consulate official stated that the Consulate itself had no such authority, but that the matter could be presented to the French Ministry of Public Health and Population and he inquired whether the State Department would recognize plaintiff as American if the French Government annulled plaintiff's application for French citizenship. Exhibit 8 reads as follows: "1148 Fifth Avenue, New York, 28, N. Y., September 29th, 1947, Mrs. R. B. Shipley, Chief of Passport Division, Department of State, Washington, D. C. Re: Mary Louise Boissonnas. My dear Mrs. Shipley: Mr. Forster and I, who are here in New York, *again* visited the French Consulate last Friday. We were informed that the Consulate did not have the authority here to annul *ab initio* the document which Mary Louise Lobenstine, as she then was, signed on December 12, 1933, requesting French citizenship, a step taken by her with the understanding that she was not thereby losing her American citizenship. M. de la Porte, who was the same person at the Consulate whom we had seen before, stated that the next steps would have to be taken in Paris with the Ministere de la Santé Publique et de la Population. Would it be possible for you or Mr. Scanlon to give to Mr. Forster and myself or to Mrs. Boissonnas a statement that in view of the circumstances under which the application for French citizenship was made, the State Department would recognize her American citizenship as from the date of that application provided she can secure the annulment from the French authorities? Mr. Scanlon very kindly said that he would send me a copy of the American law bearing upon this subject. I suggest that any such statement be sent to us jointly at the office of Mr. Henry Forster, 14 East 47th St., New York, 17, N. Y., since he is still a trustee of Mrs. Boissonnas' affairs. I wish to take this occasion to express the very warm appreciation of Mr. James Case, Mr. Forster and myself who met with you and Mr. Scanlon last week for your help in considering the best way for Mrs. Boissonas to regain her American citizenship. Yours very sincerely, E. C. Lobenstine."

28. By letter of November 18, 1947, the State Department advised Dr. Lobenstine (Ex. 5) as follows: "November 18, 1947. Mr. E. C. Lobenstine and Mr. Henry Forster, 14 East 47th Street, New York 17, New York. Sirs: With reference to your letter of September 29, 1947, concerning the case of Mary Louise Boissonnas, you are informed that Mrs. Boissonnas is considered by the Department as having lost

American citizenship under the provisions of Section 2 of the Act of March 2, 1907 (34 Stat. 1228), which provides that an American citizen 'shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws'. Mrs. Boissonnas is considered to have been naturalized as a French citizen under the provisions of Article 8 of the French nationality law of August 10, 1927, which provides that 'A woman who. marries a Frenchman only becomes a French woman on her express application'. The American Embassy in Paris in 1944 was furnished by the French authorities with a photostatic copy of such an application which was executed by Mrs. Boissonnas on December 12, 1933 before a French consular officer in New York City. It is alleged that prior to making the application Mrs. Boissonnas had been advised that she would not thereby lose her American citizenship but would, after her marriage, have a dual nationality status; that is, she would retain her American citizenship but, through her application and marriage to a French citizen, would acquire French citizenship. Obviously, this advice was erroneous in view of the provisions of Section 2 of the Act of March 2, 1907, 34 Stat. 1228. Your letter under acknowledgment is designed primarily to obtain the view of the Department as to whether Mrs. Boisonnas would be considered an American citizen provided her naturalization as a French citizen is canceled *ab initio*. In the absence of a decision of a competent court in an analogous case, it is the view of the Department that, if the appropriate French authorities should cancel, *ab initio,* the naturalization of Mrs. Boissonnas as a French citizen, she could properly be held not to have lost her American citizenship under the provisions of Section 2 of the Act of March 2, 1907. Sincerely yours, (Signed) R. B. Shipley, R. B. Shipley, Chief Passport Division."

29. Francois Monahan, a French lawyer in Paris retained by plaintiff's husband, on November 28, 1947 (Exs. 6 and 6A) requested the French Ministry of Public Health and Population to annul plaintiff's Declaration of December 12, 1933. Ex. 6, (as translated in Ex. 6A) is as follows: "Paris, November 28th, 1947. To the Minister of Public Health and Population, Sub-Division of Naturalizations, Bureau of Declarations, 17 rue Scribe, Paris. Dear Sir: I have the honor to request you to authorize the annulment of the application for obtaining the French nationality, which was filed by Miss Mary Louise Lobenstine, on December 12th, 1933, under the following circumstances: Miss Mary Louise Lobenstine, an American citizen, born in New York City, on June 4th, 1914, daughter of Anne Munroe Williams, born in Syracuse, New York, and of Ralph Waldo Lobenstine, born in Leavenworth, Kansas,—who died in 1931—both American citizens, married in New York, on December 16th, 1933, Mr. Remi Boissonnas, of French nationality. Before the marriage, questions relating to the 'Livret de Famille' (family records) and passports arose. Neither Mrs. Lobenstine nor her daughter, then 19 years old, intended that the latter renounced her American nationality; however, if it were possible for her to keep her American nationality they thought it only natural that the young woman should acquire the nationality of her husband. In a letter dated November 8th, 1933—a photostatic copy of which I am enclosing herewith—the French Consul General, after indicating the procedure with respect to the application for obtaining the French nationality, stated the American Law and concluded thus: ' * * and, as a consequence, you will have both the French and American nationalities.' On the basis of said advice, Miss Lobenstine filed her declaration on December 12th, 1933. The American authorities issued an American passport to her, which passport was always renewed until the Embassy of the United States left Paris, in 1941. The Embassy always considered Mrs. Boissonnas as an American. She signed the registers at the same time as the other persons of American nationality for a period of eight years, from 1933 to 1941. After the liberation, the American authorities examined with the greatest care the status of these of their nationals who had

remained in France during the occupation, which was the case with Mrs. Boissonnas, who did not wish to leave her husband. Then, at that time, the Embassy refused to deliver a new passport to Mrs. Boissonnas, on the ground that the declaration of December 12th, 1933, pursuant to which she had acquired the French nationality, implied the loss of her American nationality, through the exercise of the right of expatriation. Mrs. Boissonnas' family did not hesitate to take the case before Mrs. Shipley and Mr. Scanlon, the highest authorities on the matter in the State Department, in Washington. The State Department took the position that, in principle, Mrs. Boissonnas had irrevocably lost her American nationality and that should she desire to become an American again, she would be treated as an ordinary emigrant. But the quota is filled and this procedure would require a residence of five years, at least, in the United States. However, owing to the letter of the French Consul General, dated November 8th, 1933, the State Department recognized that Mrs. Boissonnas never had the intention to abandon her American nationality, that nothing in her later actions implied such an abandonment, and concluded that if the declaration in question could be cancelled or considered as non existent they would recognize Mrs. Boissonnas' American nationality and immediately deliver an American passport to her. I am bearing in mind the fact that article 91 of the order of October 19th, 1945 provides that it is possible for the French Government to authorize a French citizen to lose the French nationality, but on one condition, to-wit: such French citizen must have a foreign nationality and such case, consequently, must involve a question of double nationality. Under the present circumstances, should Mrs. Boissonnas lose her French nationality—the declaration of December 12th, 1933 being maintained—she would find herself without a country. In view of the foregoing, I am hereby requesting you, on behalf of Mrs. Boissonnas, to give assistance in obtaining that Mrs. Boissonnas' American nationality be recognized and, in the absence of any other means to arrive at such result, to authorize the annulment of her declaration of December 12th, 1933. Respectfully yours, Francois Monahan Attorney-at-Law. P. S.—For your information, I am also enclosing herewith copy of the letter from the State Department which Mrs. Boissonnas received today and has just communicated to me. Said letter confirms the position taken by the State Department, as indicated in the foregoing."

30. The Ministry replying (to Exhibit 6) stated that the Declaration of December 12, 1933 was in "perfect regularity" but the matter of recovery of plaintiff's American nationality might be referred to the American authorities. (Exs. 7 and AA). Exs. 7 and AA are as follows: "Republic of France, Ministry of Public Health and Population, Population Department and Naturalization Department, Sub-Division of Naturalizations, Reference to be mentioned: 7th Bureau No. 516 X 34. Paris, 17 rue Scribé, January 12th, 1948. The Minister of Public Health and Population To: Mr. Francois Monahan, Attorney-at-Law, 52 Avenue des Champs Elysées, Paris (8th) In pursuance of your letter of November 28th, 1947, concerning Mrs. Boissonnas, nee Mary Lobenstine, I advise you that it is essential to inform the American authorities that it is for them to consider favorably the case of the interested party in order that the latter may recover her original nationality. In fact, such a reinstatement will cause Mrs. Boissonnas to lose automatically the French nationality, in accordance with Article 87 of the Code on Nationality. Such a solution seems to be the only one to be possibly envisaged because the request for annulment of the declaration subscribed on December 12, 1933 by the interested party at the time of her marriage cannot be granted in view of its perfect regularity, and furthermore, because it is not the direct cause of the loss by Madam Boissonnas of her American nationality. (Signed) illegible Asst. Director of Naturalizations for the Minister of Public Health and Population".

31. The Ministry of Public Health and Population is an administrative governmental agency since the French liberation, in charge of Nationality matters in France. The archives of the Ministry of Justice, Department of Naturalization, have been transferred to the Ministry of Public Health and Population.

32. Plaintiff signed the "Declaration" (Ex. 4) voluntarily and of her own free will and accord, fully realizing that whatever actions she was taking to acquire French citizenship were taken by her voluntarily.

33. The "Declaration" just above referred to was signed by plaintiff in triplicate. At the same time it was signed by "R. Tanquerey, Vice Consul in Charge of Consulate General".

34. On December 12, 1933, when plaintiff signed the "Declaration" (Ex. 4) she did so intending to and she did "claim the French Nationality of" her husband (to be). She did this voluntarily and in order to become, and upon her marriage following the "Declaration" she did become a French National and citizen. She thereby intended to relinquish, and she did relinquish, her American citizenship.

35. In signing the "Declaration" (Ex. 4) above referred to, on December 12, 1933, plaintiff did not rely on the statements made in the letter (Ex. 3) of the Consul General, that "if you comply with the above, as a consequence you will possess both the French and American nationalities". Irrespective of this statement it was plaintiff's intent on December 12, 1933 to become a French National and citizen "in any case" and it was with this intent that she voluntarily signed the "Declaration" (Ex. 4).

36. On October 17, 1933 (prior to the receipt by her of the Consul General's letter of November 8, 1933 (Ex. 3) plaintiff signed an affidavit (Ex. E) in which she states that she is a citizen of the United States but that she is "departing for France during the latter part of December, 1933", and that she "intends to take up a permanent residence in Paris, France and in-tends to forward to Paris, France, previous to her departure, as part of her household equipment" certain articles of furniture, silverware, linens, etc; "that she is to be married on or about the 16th day of December, 1933, to Monsieur Remi Boissonnas, a citizen of France, previous to her departure and that she intends that the gifts received by her on her wedding will be shipped to France subsequent to her departure". This affidavit was prepared for plaintiff at her request, at the office of Messrs. White & Case, attorneys-at-law, in New York City. (Ex. C).

37. There was some discussion during the time of plaintiff's engagement until her marriage regarding the effect of her marriage on her American citizenship. The interest in these discussions was principally on the part of plaintiff's relatives and her future husband.

38. Plaintiff was exceedingly fond of her mother, Mrs. Aylmer, and advised with her. Together they were visiting at the home of Mrs. Aylmer's sister, plaintiff's aunt, in Montreal, Canada, on November 5, 1933, when plaintiff wrote her letter (Ex. 2) to the French Consul General and also when a few days later plaintiff received the Consul General's letter of November 8, 1933 (Ex. 3). Mrs. Aylmer, however, had not seen plaintiff's letter of November 5th (Ex. 2) and did not know of any letter received from the French Consulate (Ex. 3) as the basis of plaintiff's requesting French citizenship.

39. Plaintiff had forgotten all about her letter of November 5, 1933 (Ex. 2) to the Consul General in New York and his reply thereto of November 8, 1933 (Ex. 3) until she saw copies of them after 1944. Even at the trial of this case plaintiff had no recollection of the letters because (she stated) "Recollection and fact are being confused in my mind. I do not know whether I recollect it or whether my knowledge of the letter is because I have seen the copies". These were the photostatic copies sent to plaintiff, or her husband, (who were in Paris), by her uncle, Dr. Lobenstine, (who was in New York)

after he secured them from the French Consulate in New York in 1947—(Finding No. 26).

40. While at some later time, long after she signed the "Declaration" plaintiff may have assumed that she had "dual" citizenship and may have so held herself out to others, nevertheless, the statement of the Consul General in his letter of November 8, 1933 (Ex. 3) is not what induced her to sign the "Declaration", at the time she did sign it on December 12, 1933. Her intent, at that time to become a French citizen and thereby relinquish her American citizenship is clear, upon the record, and under the proof in this case.

41. There was no "mutual mistake" made in this case. The Consul General may have been mistaken in the information he gave plaintiff in his letter of November 8, 1933 (Ex. 3) but plaintiff did not rely on this "mistaken" information, nor was she induced thereby to sign the "Declaration" (Ex. 4). She fully understood the contents of Exhibit 4. There was no mistake on her part when, on December 12, 1933, she signed the original.

42. There was no "mutual mistake" as between the parties to this action. The defendant here is in effect the Department of State of the United States, through its Secretary. Plaintiff does not claim, either in the pleadings or at the trial, to have received any information from the United States State Department or any United States Government official with regard to her claimed dual citizenship prior to the time (or at any time thereafter) she signed the Declaration of December 12, 1933 (Ex. 4).

43. The doctrine of "mutual mistake" has no application in this case. It is to set aside the Declaration of December 12, 1933 (Ex. 4) which plaintiff claims "was signed under a mutual mistake of fact" that her counsel states to be "our case in a nut shell".

44. Though a minor, nineteen years of age, on December 12, 1933, when she signed the "Declaration" (Ex. 4) and when she was married on December 16, 1933, never-theless plaintiff at nineteen took every affirmative step that had to be taken and did everything required to be done, to obtain and acquire French citizenship. After voluntarily signing the "Declaration" in order to "claim the French Nationality of the husband" she proceeded to, and did, marry a French National and citizen. She went with him to France in December, 1933, and has resided and made her home there ever since. She intended that to be her "permanent" home in accord with her affidavit of October 17, 1933 (Ex. E). Although advised on December 19, 1944, that the acquisition of French nationality meant the loss of American nationality, plaintiff continued to maintain her domicile in France.

45. What plaintiff did while a minor, nineteen years of age, was not a nullity. Though it may have been voidable it was not void. By her every act since becoming twenty-one years of age on June 4, 1935, plaintiff has ratified her choice of French citizenship.

46. At any event, since December 19, 1944, when her claim of "dual" citizenship was challenged by the American Embassy in Paris, plaintiff has done nothing to elect to have American citizenship as her single nationality. From that date, at least, she has fully ratified her choice of French citizenship.

47. Article V of the French Law of August 10, 1927, is not applicable to this case.

48. Plaintiff became naturalized in France by virtue of Articles 8 and 10 of the Decree of August 10, 1927.

49. Article 8 of the Decree of August 10, 1927, reads as follows: "When a Frenchman marries a foreign woman, the officer of vital statistics requests the future spouse, except where an exemption has been granted by the Attorney General, to submit with the documents necessary for the celebration of the marriage a certificate of custom indicating with regard to her national law the effects of the marriage entered into with a foreigner on the nationality of the woman. (Ex. Y–2). If the woman in question does not necessarily acquire the nationality of her husband, ac-

cording to its statutes, and if, applying Article 8 of the Law on Nationality, she states her intention of taking French nationality, she must sign a declaration to that effect before the civil officer (officer of vital statistics), before the celebration of her marriage. This declaration is drawn up in duplicate; one copy is delivered to the person concerned, the other with a copy of the marriage certificate, is sent, through the Republic's Solicitor to the Chancery to be placed in the archives." (P 254, Ex. HH).

50. Article 10 of the Decree of August 10, 1927, reads as follows: "Where the foreign woman who marries a Frenchman outside of France, does not necessarily acquire her husband's nationality through marriage in accordance with her status, and if she intends to request French nationality in accordance with Article 8 of the Law of August 10, 1927, she must make a declaration to this effect, prior to the celebration of the marriage, before a French diplomatic or consular agent. She submits, with her birth certificate, the certificate of Custom referred to in Article 9 of the present Decree. The declaration is made in three original copies, one of which is kept in the archives of the embassy, legation, or consulate where the document has been received, and the two others are given, one to the interested party, the other (sent) to the Chancery, together with a copy of the marriage certificate." (Ex. Y–3).

51. The "Declaration" of December 12, 1933 (Ex. 4) signed by plaintiff states at the outset: "Application of Article 8, first paragraph of the Law, and of Articles 8 and 10 of the regulations".

52. Plaintiff has expatriated herself as a citizen of the United States.

## Conclusions of Law

1. This Court has jurisdiction of this cause.

2. Plaintiff's Declaration of December 12, 1933 was not made under a mistake of fact.

3. Plaintiff intended to expatriate herself by her execution of the Declaration of December 12, 1933, and her marriage on December 16, 1933 to a French National and citizen.

4. Section 2 of the (U. S.) Citizenship Act of 1907 (in force in December, 1933) reads as follows: "Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state".

5. Plaintiff never formally swore allegiance to France or any other foreign state.

6. In order to expatriate herself it was not necessary to accomplish it, for plaintiff to take "an oath of allegiance to (France or) any foreign state".

7. Plaintiff was naturalized in France in conformity with its laws.

8. Under the Nationality Law of France, dated August 10, 1927, and effective after that date, plaintiff voluntarily acquired French nationality and citizenship "on her express application".

9. At nineteen years of age, plaintiff complied with all the conditions under the Nationality Law of France dated August 10, 1927, and the Decree of August 10, 1927, setting out the French regulations under that law.

10. What plaintiff did at nineteen years of age to voluntarily become "naturalized in" France "in conformity with its laws" was not a nullity. It was not void but at most, only voidable.

11. Plaintiff has maintained her French nationality and citizenship both before and after attaining her majority and has at all times accepted the privileges and benefits thereof.

12. Beginning when she was nineteen years of age (immediately after her marriage in December, 1933,) and continuously thereafter, plaintiff has made, and intended to make, France her permanent home and domicile.

13. At the age of twenty-one, plaintiff ratified her French nationality and citizen-

ship and was, therefore, expatriated by foreign naturalization.

14. On December 19, 1944, when plaintiff was thirty years of age, plaintiff was denied at the American Embassy in Paris, France, an American passport and was advised that she had expatriated herself by her French citizenship voluntarily acquired.

15. Plaintiff thereafter elected to continue to accept and claim the benefits and privileges of French citizenship.

16. After December 19, 1944, plaintiff never elected American citizenship.

17. Under Section 2 of the Citizenship Act of 1907 plaintiff has expatriated herself as a citizen of the United States by French naturalization in conformity with the Law of France.

18. Judging at least from December 19, 1944, plaintiff is expatriated.

19. It is presumed that public officials act correctly in accordance with law until the contrary appears.

20. The presumption of regularity supports the official acts of public officers and in the absence of clear evidence to the contrary, the courts presume that they have properly discharged their official duties.

21. The presumption of official regularity applies to acts of foreign officials as well as American where their conduct has not been questioned by the authority under which they are acting and to which they are responsible.

22. There was no evidence presented either "clear" or otherwise to overcome the legal presumption that the proper French officials in charge of the matters here under consideration in all respects properly discharged their official duties.

23. Plaintiff is bound by the legal consequences of her own voluntary act.

24. The prayer of plaintiff's Amended Complaint is denied.

25. Defendant is entitled to judgment on the merits.

26. The cause is dismissed at plaintiff's costs.

Counsel may prepare and submit, on notice, a judgment in accordance herewith.