**TAKEHARA v. DULLES, Secretary of State of the United States.**

No. 13555.

United States Court of Appeals
Ninth Circuit.

June 11, 1953.

Bone, Circuit Judge, dissented.

Toru Sakahara, Gerald Shucklin and Hile, Hoof & Shucklin, Seattle, Wash., for appellant.

J. Charles Dennis, U. S. Atty., Seattle, Wash., Guy A. B. Dovell, Asst. U. S. Atty., Tacoma, Wash., for appellee.

Before HEALY, BONE, and POPE, Circuit Judges.

HEALY, Circuit Judge.

This appeal is from a denial of appellant's application under 8 U.S.C.A. § 903 for a decree adjudging him to be a citizen of the United States.

The findings below were these: Appellant was born in the State of Washington in 1926 of Japanese-born parents, nationals of Japan. At the age of four years he was taken to Japan for a visit with his grandparents, and after some months there returned to the United States. In 1935, in company with his older brother, he again went to Japan to be with his grandparents. The brother returned to the United States in 1939, and appellant remained in Japan, attended school during his minority and worked on a farm. During World War II he was given a physical examination preliminary to serving in the Japanese Army, but was rejected because of his failure to measure up to physical requirements. On April 5, 1947, shortly after obtaining his

majority,[1] he voted in the Japanese election held on that date, this being during the military occupation by United States forces. The concluding finding, nebulously indicative of the court's approach to the case, we quote in full:

"That the evidence before the court reveals that the plaintiff in implicit obedience to his elders and without objection on his part at any time had grown up from early childhood as a Japanese National, completely forgetful of the language, customs and ways of the land of his birth, and that neither at the time of nor at any time prior to the Japanese political election on April 5, 1947, had he then or on any other occasion asserted his claim to American citizenship or objected to being treated by his elders or the authorities as a Japanese National; and such being the situation and in view of the plaintiff's antecedents, his upbringing and schooling in the language, customs, habits and ways of Japan by those equally unobservant of anything attached or related to his becoming a National of the United States by choice, and in view of his naturalization as a Japanese National and his admitted ignorance of the effect of his voting upon his claim to American citizenship, it must follow that the plaintiff had no reason to abstain from voting in the Japanese political election of April 5, 1947, and did so as a natural consequence of a Japanese National's interest therein, by whatever inducement, and without any relation or reference to his claim to being a National of the United States."

The court concluded that by virtue of his voting appellant had expatriated himself under the statute.

We turn for a moment to the evidence concerning the circumstances under which appellant voted at the Japanese election. Appellant, testifying through an interpreter, was the only witness who gave information on the subject. He said that he was taught implicit obedience to his elders; that while taking his army physical during the war he was kicked and struck for trivial reasons; that by means of newspapers and radio everyone was told that he should vote in the election; that after his grandfather had voted he told appellant that there were Japanese police and American military police at the polls, and that if he did not go to the polls he might get into trouble such as cancellation of his food ration card or other trouble. His uncle, too, he said, conveyed the same message to him as had his grandfather.

Since this was obviously a claim that the voting was not voluntary within the intendment of 8 U.S.C.A. § 801, a glance at the opinion of the trial court, as distinguished from its findings, may be helpful. In the opinion it was said to be clear that no actual physical force was used to make appellant vote. The judge observed that "[m]ost courts seem to have attempted to repeal the statute by a 'liberal' interpretation of the word 'voluntarily.' With these interpretations the Court does not agree." The judge remarked that he did not accept the theory that appellant voted because he feared the loss of his ration card, but that he obeyed the directive of his grandfather and uncle to vote at the election. "In any event," said the judge, "the fear of loss of a food rationing card is not sufficient to raise the doctrine of duress in commercial transactions, and no good reason is seen why it is acceptable in an important transaction of this type." The judge added that if such were not the case, appellant lost his citizenship by his conduct "of which voting is a minor factor." He observed that appellant had been brought up in the native Japanese tradition and educated in a family and social background requiring implicit obedience to his elders and the Imperial Government of the Emperor; that he was educated in Japanese schools, and has no education in English or training in our form of government. Further, he remarked that, since responsibility as well as allegiance is individual, it is immaterial that a brother of appellant was killed in the American service during the war and that another is presently in the American army.

**1.** He reached the age of twenty-one on March 13, 1947.

■ It would seem, on the whole, to have been the philosophy of the trial judge that the manner of appellant's upbringing unfitted him for American citizenship, and that neither prior to nor upon his reaching his majority had he elected to retain it. The case was decided prior to Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, 138, in which the Court held that it is not legally required that a citizen by nativity elect between dual citizenship upon or after reaching majority. The Court thought that "the dignity of citizenship which the Constitution confers as a birthright upon every person born within its protection is not to be withdrawn or extinguished by the courts except pursuant to a clear statutory mandate."

■ The government argues that while appellant was not required to make an election he might choose to do so, and that he did so choose by voting. However, in order to effect expatriation the voting must have been voluntary. A number of district courts have held that the fear of loss of a ration card is sufficient to constitute duress.[2] These decisions the trial court repudiated, but we think the validity of the view taken in them was recognized by us in Acheson v. Mariko Kuniyuki, 9 Cir., 189 F.2d 741.

■ A study of the findings and opinion below indicates unmistakably the view of the judge that the very upbringing of appellant rendered it inevitable that he would obey the orders of his elders in the matter of voting, from which it would seem to follow that the voting was not representative of a voluntary choice on appellant's part. Compare the facts here with those in Tomoya Kawakita v. United States, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249, where Kawakita claimed unavailingly that by choice after majority he had expatriated himself. We think the holding below is out of line with the Kawakita decision, as well as wholly inconsistent with the philosophy of Mandoli v. Acheson, supra. The inconsistency with the latter case becomes all the more glaring upon a study of the opinion of the dissenting justices.

The judgment is reversed and the cause is remanded with directions to make a finding on the question whether appellant's voting was voluntary, such finding to be made in light of what the majority has here held to be the law.

POPE, Circuit Judge (concurring).

I agree that the case of Mandoli v. Acheson, 334 U.S. 133, 73 S.Ct. 135, decided after the decision of the trial court, necessitates a reversal. I also agree that by our decision in Acheson v. Mariko Kuniyuki, 9 Cir., 189 F.2d 741, we approve the view of the law expressed by Judge Yankwich in Hichino Uyeno v. Acheson, D.C., 96 F. Supp. 510. I think, however, that these conclusions lead to the result that there remains a question of fact undecided, namely, whether the appellant's voting was voluntary. As I read the record this question has not yet been decided in the light of what we have here held to be the law. I believe that this is a question of fact which is properly for the trial court and not for us.

Accordingly, I am of the opinion that the cause should be remanded with directions to the trial court to make appropriate findings upon this matter.

BONE, Circuit Judge.

I dissent from the views expressed by my associates and for reasons hereafter stated I would affirm the judgment on appeal. Furthermore, I see nothing in the doctrine of the Mandoli case relied on by the majority which requires a reversal.

Appellant voted in a Japanese political election held in 1947 after he was 21 years of age (see Miranda v. Clark, 9 Cir., 180 F. 2d 257) and from the record and the inferences which might legitimately be drawn from the testimony of appellant[1] I am fully

---

2. See the excellent statement of Judge Yankwich in Hichino Uyeno v. Acheson, D.C., 96 F.Supp. 510.

1. Aside from the testimony of his father establishing such ancillary facts as the date, place of birth and age of appellant, the entire case for appellant was presented in his testimony given through an interpreter.

persuaded that the findings of the lower court are not clearly erroneous. Argument is unnecessary to emphasize that there are altogether too many imponderable factors and elements present in the process of judging the credibility of a witness (who in this case is certainly a vitally interested party and not an impartial witness) to justify us in substituting our judgment as to what the trial judge *must accept* as true in weighing the testimony of such a witness. (See cases footnote 3.) His manner of testifying, the nature and the probability of the truth of his story told through an interpreter, the appearance of candor or lack of candor in his testimony, and the other shadings and nuances of a trial, all of which cannot be disclosed to an appellate court in a cold record, are here completely stripped of significance if we disregard, as we seem to do, the obvious advantages of the trial judge in weighing these various factors.[2]

The short of it is that the trier of the facts was well within the orbit of his proper functions when he concluded (as he had every right to do) that appellant's testimony was also to be considered and weighed in light of the obvious fact that appellee could not in any way rebut any sort of a story descriptive of purely subjective intentions or emotional reactions which are asserted to have induced "a state of mind" which affords the ultimate foundation for appellant's claim to American citizenship. The obvious overriding personal interest of appellant in the outcome of the case, the inherent probability, or lack thereof of the truth of his story, were clearly proper factors to be considered. The court might well weigh, as it did, the problem of whether cold objectivity characterized appellant's description of purely emotional reactions *known only to himself.*

His specific "intent" in voting is heavily stressed by appellant. It derives in a con-

trolling degree from an asserted "state of mind" resulting from "advice" from a grandfather and an uncle. Reliance is therefore placed on the fact that appellant was taught implicit obedience to his family elders. (The length of this sort of supervision would depend upon how long these elders lived which might be until a man was long past middle life.) It is this "family advice" which here provides, in essence, the alleged coercion and duress which appellant asserts *compelled* his act of voting and thus rendered it an "involuntary" act. (It is not contended that acts of Japanese and American officials coerced him into voting.) He also testified that from all the "advice" then offered to Japanese people "he thought that he was personally requested to vote."

Appellant insists that he did not *intend* to give up his American citizenship by voting and that this undisclosed intent should prevail; also that he did not *know* that one loses his American citizenship by voting.

There is nothing in the statute here applicable to suggest that the overt act of voting, (which spells expatriation under the wording of the statute) when voluntary, is conditioned upon the undisclosed *intent* of the person doing it. See Savorgnan v. United States, 338 U.S. 491, 70 S.Ct. 292, 94 L. Ed. 287; Boissonnas v. Acheson, D.C., 101 F.Supp. 138, 146, 147.

But appellant would avoid the force of the applicable federal statute on foreign voting by asserting a mistaken conclusion as to its sanctions or effects. If such a factor has decisive weight the operation of the statute would depend not upon a voluntarily performed act, but upon the extent of the *legal knowledge* and the subjective intention or motivation of the person involved. That sort of test cannot be used to determine the operation of the (voting)

2. The experienced trial judge filed an opinion in which he outlined the reasons for his findings, conclusions and judgment denying relief and dismissing appellant's action. The judge was clearly persuaded that much of appellant's story was unworthy of belief. He states that the examination indicated that appellant "was highly evasive, if not false in his testimony"—that "whenever the shoe pinched, he had a ready remedy." He points out that appellant was not physically constrained and testified only that his uncle and grandfather each suggested to him that he might lose his ration card if he did not vote. No proof was offered that anyone ever lost a ration card for that reason.

statute here involved. See Savorgnan and Boissonnas cases, supra.

As to the so-called "compulsion" here considered we face the fact that it reflects an aspect of oriental medievalism which lingers in present day Japanese family customs. The views of a majority of this Court apparently make these ancient "customs" regarding "family advice" a part of our domestic law in the teeth of the federal statute, Title 8, U.S.C.A. § 801(e). (And see its successor statute, Public Law 414, 82nd Congress, 2nd Session, Section 349(a) (5), 8 U.S.C.A. § 1481(a) (5), commonly called the McCarran Act containing the same provision about voting in a political election in a foreign country.) In effect the majority holding in this case is that these ancient family customs (not Japanese military and/or civil law) pursuant to which appellant was the recipient of the "family advice" concerning voting in 1947, compel the conclusion that an irresistible form of coercion and duress was brought to bear on the adult appellant when he received this "advice." As a consequence, he not only became wax and putty in the hands of his grandfather and uncle, but he was also shorn of all capacity for independent thinking and completely deprived of the exercise of free will; thus it follows that he was literally and legally *forced* to vote, despite the fact that the record will not sustain the conclusion that his state of mind was induced by fear of personal injury or harm.

The reasoning which would justify such a conclusion gives a strange twist to accepted legal concepts of duress and coercion. But it is the reasoning which provides legal substance for appellant's claim to American citizenship. Our statute law does not sanction it, nor has Congress ordained that a federal court may ignore or set aside a statutory provision when an ancient "family custom" of a foreign nation stands in the way of its enforcement. If we assume and hold that federal courts have such power then we may rest assured that hereafter in this circuit practically every person who voted in Japanese elections while claiming American citizenship will find it both convenient and wholly effective to assert that his act of voting was induced and compelled by "family advice" of the character here noted. His case for application of the duress and coercion doctrine which this Court now sanctions would then be complete and the United States would find itself helpless because it is unable to produce proof to refute or rebut a vague and tenuous claim based on an alleged subjective "state of mind" of an interested witness. Menefee v. W. R. Chamberlin Co., 9 Cir., 183 F.2d 720, see cases cited in dissent, at page 722. See also comment on weight which may be given uncorroborated and uncontradicted testimony of an interested witness in Noland v. Buffalo Insurance Co., 8 Cir., 181 F.2d 735, 738, 739.

I am unwilling to enthrone a doctrine that would produce such a result. Filial devotion is indeed a laudable virtue but implicit obedience to every form of advice from family elders in Japan will not and should not supplant or override American law in citizenship cases like the one at bar. If it does, then counsel relying on a claimed "state of mind" of their clients as a legal ground for relief in suits like the one at bar could successfully translate into domestic law the boast of the celebrated Daniel O'Connell, "I can drive a coach-and-six through any act of Parliament."

A vast array of cases have considered the problem whether a trial judge (or jury) is *required* to accept as true testimony which is not contradicted. The list is long so a few typical cases must suffice.[3] They are cited because the majority accepts the view

---

3. Because the appellee had absolutely no way of rebutting testimony of appellant as to his alleged "state of mind" at the time of voting the way was wide open to advance any sort of contention based on this ground. In the face of such a golden opportunity to clinch a case the wish of the witness may easily become the father of an asserted fact. In this case the trier of fact was firmly convinced that the story of appellant was too flimsy to warrant belief and afforded no tenable ground for the relief sought. He was free to disbelieve despite absence of rebutting testimony. As to *compulsion* on a trial judge or jury to accept as true

that in the instant case the trial judge was under some sort of legal compulsion to accept as true in every detail the ex parte statements of appellant (as translated) concerning *his state of mind* and his *intent* at a particular time regardless of the honest conviction of the trial judge that he had heard a story tailored to make the facts fit an attractive and alluring theory of law. Applying such a rule strips away one of the most vital functions of a trial judge and makes this appellate court a weigher of the facts.

A "state of mind" which impelled Takehara's action in voting must be regarded as a fact in issue in the instant case. Likewise, the question whether voting was a voluntary act presents a pure question of fact.

The difficulties of a trial judge in attempting to evaluate testimony of orientals which generally carries subtle shadings of fact or alleged fact is well illustrated in the honest doubts expressed by the trial judge in Mar Gong v. McGranery, D.C., 109 F. Supp. 821. His views do not overstate or over-emphasize the peculiar problem always present in this type of case. This difficulty is accented in the case at bar where all of the material testimony reached the ear of the judge burdened with whatever (perhaps unconscious) fact slants and/or shades of meaning a Japanese interpreter might choose to insert into his English translation of what was said to him by the witness. Despite the unhappy impressions left with the trial judge as a result of what he saw and heard, his judgment is upset because the majority are critical of his reactions. This goes very far in denying to a trial judge the right to appraise and weigh such factors as the demeanor and bearing of a witness and his interpreter and to arrive at a conclusion as to what to accept and what to reject when impressions are fresh in his mind. Here we have a classical example of a judge being forced to weigh the truth of statement of a witness, not by what the witness may have said but what the interpreter says that he said. In this not too easy transference of testimony, a judge has every right to be cautious in his appraisal and evaluation.

---

testimony which is disbelieved but which is not contradicted, see:

Quock Ting v. United States, 140 U.S. 417, 421, 422 and dissent, 11 S.Ct. 733, 851, 35 L.Ed. 501; Reagan v. United States, 157 U.S. 301, 15 S.Ct. 610, 39 L.Ed. 709. Cf. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Segurola v. United States, 1 Cir., 16 F.2d 563, 565; Maners v. Ahlfeldt, 8 Cir., 59 F.2d 938, 939; Wheeler v. United States, 5 Cir., 80 F.2d 678, 679, 680; Cotten v. United States, 5 Cir., 92 F.2d 809; Snapp Hotel & Realty Co. v. Elbert, 8 Cir., 108 F.2d 661, 664; Dyer v. MacDougall, 2 Cir., 201 F.2d 265, 268, 269; N.L.R.B. v. Dinion Coil Co., 2 Cir., 201 F.2d 484, 487, 488, 489, 490; N.L.R.B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, certiorari granted 73 S.Ct. 940; Dickinson v. United States, 9 Cir., 203 F.2d 336, 345; Woey Ho v. United States, 9 Cir., 109 F. 888, 890. Albert ex rel. Buice v. Patterson, 1 Cir., 155 F.2d 429, 432; Ex parte Farrell, 1 Cir., 189 F.2d 540, 542, 545. Cf. Flynn ex rel. Yee Suey v. Ward, 1 Cir., 104 F.2d 900, 902.

As pointed out in United States v. Marino, 2 Cir., 141 F.2d 771, 773, the credibility of interested witnesses is always a question of fact for the jury (citing cases). Greenfeld v. Commissioner of Internal Revenue, 4 Cir., 165 F.2d 318, 319; Heath v. Helmick, 9 Cir., 173 F.2d 157, 161; Everett v. Southern Pacific Co., 9 Cir., 181 F.2d 58, 60, 61; Noland v. Buffalo Ins. Co., 8 Cir., 181 F.2d 735, 738, 739; Menefee v. W. R. Chamberlin Co., 9 Cir., 183 F.2d 720, 723 and cases cited in dissent, at page 722; Robertson v. Territory of Arizona, 9 Cir., 188 F. 783; Minoru Hamamoto v. Acheson, D.C., 98 F.Supp. 904, 906.

Wigmore on Evidence (Third Ed. Vol. 7, Section 2034): "The mere assertion of any witness does not of itself need to be believed, even though he is unimpeached in any manner; because to require such belief would be to give a quantitative and impersonal measure to testimony." This Court has correctly characterized as "an ancient fallacy" the doctrine that a trier of fact must accept as true any and all sorts of uncontradicted testimony. See N.L.R.B. v. Howell Chevrolet Co., supra.

The California Court of Appeals in Taylor v. Bunnell, 133 Cal.App. 177, 23 P.2d 1062 also supported the rule discussed in this footnote.

The nub of this case is the fact that if appellant's claims rest on solid legal ground we must conclude that in the last analysis the outcome of citizenship claims like the one here asserted must be determined by quaint family customs in foreign countries since, as a matter of law, they obliterate clear and simple provisions of our own law. Thus, "family upbringing," and social amenities under Japanese customs which have their roots in great deference to one's elders, are held to completely devitalize a law of the United States. I can find no rational reason for sustaining such a weird theory since it is a complete repudiation of a clear-cut Congressional mandate.

And that Japanese army people were other than courteous and decent to appellant at an earlier time is no reason for upholding appellant's claim to citizenship. The earlier army incident referred to in appellant's testimony was completely dissociated from the grounds upon which he ultimately rested his case.

The claim of duress and coercion advanced in this case rests upon such flimsy and untenable grounds that it should be rejected. Appellant did not meet the burden of proof which the law puts upon him and the judgment should be affirmed.