Arthur King WILSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15301.

United States Court of Appeals
Ninth Circuit.

Nov. 14, 1957.

As Modified on Denial of Rehearing
Feb. 27, 1958.

Spurgeon Avakian, **J.** Richard Johnston, H. Helmut Loring, Oakland, Cal., Koerner, Young, McColloch & Dezendorf, Portland, Or., for appellant.

Lloyd H. Burke, U. S. Atty., John Lockley, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before DENMAN, Senior Circuit Judge and POPE and BARNES, Circuit Judges.

BARNES, Circuit Judge.

After waiving a jury trial, appellant Arthur King Wilson was tried and convicted by the District Court of six counts of willfully attempting to defeat and evade the payment of federal income taxes and Federal Insurance Contribution Act (commonly known as "Social Security") taxes withheld from the wages of employees of Coast Redwood Company, Inc., a family corporation of which appellant was President, in violation of Section 2707(c) of the Internal Revenue Code of 1939,[1] as made applicable by Sections 1430 and 1627 of said

1. 26 U.S.C.A. § 2707(c).

Code, 26 U.S.C.A. §§ 1430, 1627. The periods involved in the six counts were the second, third, and fourth quarters of 1952, which encompassed the period from April 1, 1952 to December 31, 1952, inclusive. Counts One, Two, and Three related to income taxes allegedly withheld and not paid over in the respective amounts of $49,913.33, $15,605.48,[2] and $41,149.38. Counts Four, Five, and Six dealt with F.I.C.A. taxes allegedly withheld and not paid over in the respective sums of $5,559.95, $3,807.79, and $2,043.69.

The indictment charged in each and every count that appellant had committed the felonious offense

"* * * by failing and refusing to pay said * * * taxes withheld from wages of employees to the Collector of Internal Revenue or any other person authorized by law to receive them, and by causing said corporation to fail and refuse to pay said taxes, and by withdrawing and causing funds to be withdrawn from the bank accounts of said corporation for the personal use and benefit of said defendant and corporations owned and controlled by said defendant and members of his family, and by causing said corporation to pay creditors other than the United States * * *"[3]

Appellant raises two questions on this appeal. The first and principal question may be characterized broadly as concerning the sufficiency of the evidence to support the denial of a motion for judgment of acquittal made at the close of the Government's case-in-chief and renewed after all the evidence was in. Actually appellant's argument on this point has two facets. He complains that the District Court applied an erroneous standard with respect to the subjective state of mind requisite to culpability under Section 2707(c), and further, that under the proper criterion the evidence is not sufficient to support the denial of his motions and the judgment of conviction. The other question tendered herein pertains to alleged error in the exclusion of evidence.

This is a unique criminal case. There does not appear to be a single reported decision involving a felony prosecution for failure to pay withholding taxes. The instant case is not distinguished for that reason alone. It is unusual as well in that the acts alleged to constitute the necessary overt and objective element of the violation of Section 2707(c) do not conform to the tapestry and pattern of deception, concealment, and artifice ordinarily found in criminal tax evasion cases.

The evidence, largely uncontroverted, discloses that appellant organized and incorporated Coast Redwood Co., Inc., in the State of California in May of 1945. It engaged in the logging and sawmill business with operations centered in the redwood and fir forests of Northern California. The stock in the corporation was wholly owned by appellant and members of his family and he served actively as President from the date of incorporation. Coast Redwood Co. was one of several interrelated corporations owned entirely or substantially by appellant and members of his family and actively operated by appellant as President. Most of its business transactions and dealings were with these affiliated corporations. It functioned as a middle link in a vast chain of lumber enterprises whose activities extended from the acquisition of timber tracts to the sale of finished lumber. Two of these affiliated corporations, Union Bond and Trust Company and Ah

---

2. The total sum withheld for federal income taxes in the third quarter of 1952 was $44,524.53. However, a partial payment was made in this quarter in the amount of $28,919.05, leaving a balance due and unpaid of $15,605.48.

3. The Government was not required to allege the particular manner by which the offense was committed. United States v. Simmons, 96 U.S. 360, 24 L.Ed. 819. The allegations are here set forth to crystallize the Government's position, not to state an essential element of the offense.

Pah Redwood Company,[4] owned or were purchasing the timber tracts upon which Coast Redwood Co. conducted its logging and cutting operations. Still another family corporation, A. K. Wilson Lumber Company, purchased rough lumber from Coast Redwood and remanufactured it into finished lumber for sale in the trade. In 1952 Coast Redwood sold all of its redwood log cants to A. K. Wilson Lumber Co.

Coast Redwood had originally been capitalized for $5,000.00. It enjoyed success and prospered in the years preceding the indictment period and for that reason and perhaps also due in part to monies derived from an abortive sale of certain assets of the corporation,[5] Coast Redwood Company's capital at the end of the fiscal year on April 30, 1952 included earned surplus of $306,433.04. This despite the fact that the corporation had encountered financial difficulties during that fiscal year and had incurred a net loss therein of $274,323.95. Adversity continued to plague the corporation during the fiscal year ending April 30, 1953 (which included almost the entire period covered by the indictment), and it sustained a net loss of $224,099.32. Part of this loss (the exact extent is vigorously disputed) was attributable to a summer fire which destroyed cut timber and hampered operations. As a result of its intensified financial plight, Coast Redwood Co. initiated proceedings under Chapter Eleven of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq., on January 30, 1953. It was adjudicated a bankrupt on November 9, 1954.

A study of the past tax record of Coast Redwood Co. fails to reveal a portrait of a dutiful and diligent taxpayer. It had been delinquent in respect to meeting its obligation to pay over withheld income and Social Security taxes to the Government as long ago as 1947 and 1948. Again, at the start of the indictment period (namely, April 1, 1952), Coast Redwood Co. was delinquent in the payment of prior withholding taxes. Pursuant to an understanding reached with the Internal Revenue Service, it was paying off these past obligations at the rate of $1,000 per week. The sums paid during the indictment period were credited seriatim to the oldest outstanding obligation, in accordance with existing Internal Revenue Service policy where no instructions to the contrary are given. Neither Coast Redwood Co. nor appellant requested or instructed that the sums be applied in any different manner. Accordingly, the monies paid over to the Government during the indictment period, with the exception of the partial third quarter payment, served only to diminish prior obligations and not to pay current liabilities. However, it should be observed that payments made during each quarter of the indictment period and applied to accrued obligations did not in any instance equal or exceed the amount of money withheld and not paid over during that particular quarter.[6]

Appellant has resolutely maintained from the inception of the investigation into Coast Redwood Company's tax situation that the failure to pay the tax obligations on time was ascribable to the lack

---

4. The Ah Pah Redwood Company was a wholly owned subsidiary of International Pulp & Paper Company. Appellant and his family owned all of the common stock and 20% of the preferred stock in the latter corporation.

5. Early in 1951, appellant sold the sawmill and other assets of Coast Redwood Co. to a Mr. Hull, who paid appellant $925,000 in cash prior to taking possession of the sawmill in April, 1951. Mr. Hull was unable to make the installment payments required by the agreement of sale and appellant resumed control of these assets in December, 1951. When

questioned as to the disposition of the money received from Mr. Hull, appellant stated that it was used "to pay bills and get the property in shape where we could deliver it to Mr. Hull when the time came." [Tr. 668.]

6. An aggregate amount of $87,973.00 was paid over to the Collector of Internal Revenue during the indictment period, of which the sum of $28,919.05 was applied, as noted previously, to the third quarter liability and the balance of which was credited to back taxes which accrued prior to the commencement of the indictment period.

of sufficient funds. It was not that Coast Redwood Co. never had adequate funds to meet its tax obligations. The corporation's books and accounts completely refute such a contention. Coast Redwood Co. kept two bank accounts which during each month of the indictment period reached substantial credit amounts, although, it must be added, the general overall state of these accounts was one of constant overdraft.[7] It was rather, appellant claims, that Coast Redwood Company's financial resources were so severely drained by the business setbacks it was experiencing in 1952, and it was so beset by other pressing obligations and impatient creditors that it was not possible to pay the Government in full if the corporation was to survive. Consequently, as appellant depicts the scene, Coast Redwood Co. was confronted with a continuing perplexing problem arising from the described predicament—who shall be paid and how much?

■ Appellant was chief executive officer of the corporation. It was his responsibility to determine how corporate funds should be expended. He was not himself the "disbursing officer" for the corporation, but he had the final word as to what bills should or should not be paid, and when. Possessed of such authority and power, he came within the purview of Section 2707(d) of the I.R.C. of 1939, which defines a "person" subject to the preceding subsections of § 2707.[8] Appellant asserts that his choice was highly circumscribed. He says he could have paid the Government in full and neglected most of the other creditors

entirely. Had he done this, appellant submits, Coast Redwood Co. would have been forced to shut down. He could have apportioned payments of available funds to various creditors, including the Government, and continued in business. Appellant states that he wanted to remain in business, expected and hoped to extricate Coast Redwood Co. from its embarrassed financial status, and planned to pay off all creditors in full. Of course, attainment of his related objectives lay with the latter alternative, which appellant therefore chose to pursue.

In order to stay in business, Coast Redwood Co., according to appellant, had to pay its current trade obligations such as payroll, suppliers, log haulers, insurance, and other similar operating expenses. Otherwise the necessary services rendered by this group of creditors would not have been forthcoming. Accordingly, appellant ordered that these obligations be accorded top priority. An Internal Revenue Service agent quoted appellant as later saying that he was, in effect, robbing Peter to pay Paul and the United States was Peter in this instance. The agent testified that appellant also admitted that the Government rated a low priority. Appellant does not deny that the Government was not given first preference but urges in justification of his policy that he was at all times trying to do what he thought most likely to assure preservation of the corporation and eventual payment in full to all creditors, including the United States.

Wilson did not seek to conceal his policy or Coast Redwood Company's ac-

---

7. Coast Redwood Company's bank accounts can most accurately be characterized as active and fluctuating. The following example vividly illustrates the dynamic state of the corporation's bank accounts. Its commercial account at the Arcadia Branch of the Bank of America showed a balance of $921.44 on August 8, 1952. The next day the balance was $18,816.85. And on August 11, 1952, the account showed that $20.76 was overdrawn.

8. Section 2707(d) provides as follows: "The term 'person' as used in this sec-

tion includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

Appellant does not contest on this appeal the sufficiency of the evidence to support a finding that this provision applies to him, Cf. Levy v. United States, D.C., 140 F.Supp. 834; Cushman v. Wood, D.C.1956, 149 F.Supp. 644; Wade v. United States, 54-2 USTC 49,066 (1954).

tual tax liability from the Government. Throughout the indictment period Coast Redwood Co., under appellant's stewardship, filed full, accurate and timely tax returns reflecting the amount of money owed. Appellant acknowledged, and never disclaimed, Coast Redwood Company's tax liabilities. He simply refused to direct their payment.

The operations of Coast Redwood Co. were considerable in scope and volume. During the indictment period its gross receipts totaled $2,412,635.00 and its total disbursements amounted to $2,414,263.00. As heretofore noted, Coast Redwood Company's business activities were conducted principally with affiliated corporations. Many of the expenditures and receipts during the nine month period covered by the indictment involved these affiliates. The inter-corporate dealings and transfers of funds from one entity to another were numerous and complicated. Counsel for both sides devoted much attention and placed much emphasis upon whether these dealings and transfers constituted an affirmative attempt to siphon off available funds to affiliates, and were designed by appellant to evade and defeat the payment of the tax obligations. No useful purpose would be served by encumbering this opinion with complications of these myriad transactions in light of our disposition of this appeal and the grounds therefor. It suffices to say that the original set of figures shows a net inflow to Coast Redwood from these dealings; the adjusted journal entries indicate a net outflow resulted from these transactions. A considered analysis of the evidence adduced on this point leads to the conclusion that while some dealings are questionable it does not appear that Coast Redwood Co. flagrantly favored, or was favored by, its affiliates. For example, while it is true that Coast Redwood Co. granted A. K. Wilson Lumber Co. a five percent discount for non-existent brokerage fees on log cants sold to it, it is also true that Coast Redwood Co. purchased its stumpage at the same price paid by its affiliates to the timber tract owners.

Appellant supports various payments made to affiliates in preference to clearing up the tax obligations on the ground that these payments and in some instances, loans, were necessary to keep the other corporations solvent, and that in view of the interrelationship between his various corporations it was essential to Coast Redwood Company's continued existence that the affiliates remain in business. It should be noted here that the evidence fails to reveal any diversion of funds from the corporation directly to appellant or his family. Appellant drew no salary during the indictment period and the corporation never declared or paid a dividend in its ill-fated lifetime.[9]

It should be noted also that appellant's version of Coast Redwood Company's dire financial condition and consequent dilemma, especially the assertion that preservation of the business rested on non-payment of the tax liabilities, was challenged by the Government and apparently disbelieved by the court below. The District Court was seemingly

9. Two Coast Redwood Co. checks were drawn to the order of appellant during the indictment period. The first was a $1000 check drawn in October, 1952 by an employee acting apparently without appellant's knowledge and consent. It was restored to Coast Redwood Co. the next month. The second was a $19,000 check issued on November 28, 1952. The sum represented by this check wove a tortuous path through appellant's many corporate entities, but did not come to rest in his account. The sum was transferred to the account of A. K. Wilson Lumber Co., which treated the transaction as a transfer of funds from Coast Redwood Co. to Union Bond, and from Union Bond to A. K. Wilson Lumber Co.

The Government also sought to establish that appellant was depleting the funds of A. K. Wilson Lumber Co. and thus indirectly siphoning Coast Redwood Co. funds. The basic premise of the Government's charge is that funds were transferred from Coast Redwood Co. to A. K. Wilson Lumber Co. or, A. K. Wilson Lumber Co. refused to pay its obligations to Coast Redwood Co. for tax evasion motives. Consequently, the textual discussion covers this point.

of the opinion that appellant's explanatory statements, self-serving in character, were not persuasive because the tax obligations represented a mere pittance in the overall financial dealings of the corporation. Of course, the trier of fact was free to discount appellant's testimony and no error was committed thereby. Appellant's defense has been here considered at length, not to permit an appellate tribunal to "second guess" a trial court on a factual issue, but to highlight the especial significance of the constituent mental element of the offense under the circumstances of the instant case.

Another facet of the instant fact situation deserves mention. Appellant and representatives of the Internal Revenue Service conferred from time to time during the indictment period regarding the matter of Coast Redwood Company's tax delinquencies. Invariably these conferences culminated in a promise by appellant that the corporation would, among other things, make regular installment payments of a certain sum or would settle its tax liabilities by a certain date. Just as invariably, for one reason or another, Coast Redwood Co. never fulfilled its undertakings. Nevertheless, the Internal Revenue Service acquiesced repeatedly in the delays and refrained from seizing the corporation's property in the hope that the business could be preserved; the same hope appellant urges was motivating him. Unfortunately, appellant's expectation proved groundless and his hopes were dashed. Coast Redwood Co. collapsed and was ultimately adjudicated a bankrupt. Had events taken a different turn, this case might not be before us.

■ We turn now to a consideration of the statute. Section 2707(c) provides as follows:

"Any person required under this subchapter to collect, account for and pay over any tax imposed by this subchapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this subchapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony * * * (penalties omitted)."

Since appellant both collected and accounted for the withheld monies, conviction under this section can be predicated only on the willful attempt to evade or defeat the payment of the taxes.

The conduct rendered felonious by § 2707(c)—the willful attempt to evade or defeat the payment of taxes—contains two constituent elements. They are a particular subjective state of mind—"willful"—and certain objective activity carried on pursuant to such mental state —"attempt to evade or defeat the payment of the taxes." They must coexist to constitute an offense. In other words, the defendant must have willfully engaged in the attempted evasion.

The District Court took the position during the course of the trial that the knowing and intentional disbursement to others of funds withheld from employees for payment of income and Social Security taxes constituted an offense under § 2707(c). Under this view the Government was required to prove only that appellant was cognizant of the tax obligations, that corporate funds were physically available for their payment, and that appellant intentionally chose to divert these funds to other uses. The motivation and purpose which governed the distribution of funds were deemed immaterial. Appellant asserts that this approach misconceives the requisite mental element of the crime and that it was incumbent upon the prosecution to prove that an evil motive or bad purpose controlled appellant's direction of the disbursement of Coast Redwood Company's funds.

To fully comprehend the nature of the conduct condemned by § 2707(c), it is necessary to examine the section in the statutory framework in which it appears. § 2707(c) is the apex of a series of penalties for assorted violations of the internal revenue laws. § 2707(a) prescribes a 100% civil penalty for will-

ful failure to pay, collect, or truthfully account for and pay over certain taxes and for willful attempt to evade or defeat the tax or its payment. And § 2707(b) makes it a misdemeanor to willfully fail to pay a tax covered by this subsection, make returns required by law, keep such records as are required by law, or to supply such information as is required by law. Subsections (a), (b), and (c) all require that the person act willfully in failing to perform his statutory duty.

■ However, the term "willful" is not defined in the statute. Nor does the legislative history afford illumination on this point. We move thence to the decisional law on the definition of this term. The word "willful" is susceptible of many meanings. Its interpretation is frequently influenced by its context. It may mean one thing in civil cases and quite another thing in criminal prosecutions. When used in criminal revenue statutes, it has generally been construed to mean an act done with evil motive, bad purpose, or corrupt design. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418. The Spies case, a landmark decision in this area of law, involved a felony conviction for attempted income tax evasion under Section 145(b) of the I.R.C. of 1939. The Supreme Court, in reaffirming the traditional notion of the mental element required for criminal conviction for non-payment of taxes, declared:

"The difference between willful failure to pay a tax when due, which is made a misdemeanor, and willful attempts to defeat and evade one, which is made a felony, is not easy to detect or define. * * * It (willful) may well mean something more as applied to nonpayment of a tax than when applied to failure to make a return. Mere voluntary and purposeful, as distinguished from accidental, omission to make a timely return might meet the test of willful-

ness. But in view of our traditional aversion to imprisonment for debt, *we would not* without the clearest manifestation of Congressional intent *assume that mere knowing and intentional default in payment of a tax where there had been no willful failure to disclose the liability is intended to constitute a criminal offense of any degree.* We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer." 317 U.S. at pages 497–498, 63 S.Ct. at page 367. [Emphasis added.]

The Supreme Court's precise holding in the Spies case was that the District Court erred in refusing to give a requested instruction that if the jury found only that defendant had willfully failed to make a tax return and willfully failed to pay the tax due, then it could not find the defendant guilty of a willful attempt to defeat and evade the income tax. Section 145,[10] dealing with income taxes, is analogous, and phrased similarly, to section 2707. Both statutes draw a distinction between the willful failure to pay a tax, which in each instance constitutes a misdemeanor, and the willful attempt to evade or defeat the payment of a tax, which in each instance is a felony, a distinction which, the Supreme Court readily conceded, "is not easy to detect or define." 317 U.S. at page 497, 63 S.Ct. at page 369. The Court held that the difference between the two kinds of prohibited conduct is that the word "attempt," as used in the felony section, denotes an affirmative act of evasion rather than a willful omission designed to evade the tax. The mere willful failure to pay, without more, could constitute no more than the misdemeanor.

The Supreme Court noted that Congress had used the comprehensive phrase "in any manner" in stating the modes by which a willful attempt to evade and defeat a tax might be achieved. It then

10. 26 U.S.C.A. § 145.

listed "by way of illustration, and not by way of limitation" some of the more common methods of attempted evasion, "such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. If the tax-evasion motive plays any part in such conduct, the Supreme Court stated, "the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." 317 U.S. at page 499, 63 S.Ct. at page 368.

The unusual facts of the case at bar do not reveal the common examples of badges of fraud set forth by the Supreme Court. Of course, the phrase "in any manner" covers novel and unusual as well as common methods of evasion, for it is all-inclusive. United States v. Gordon, 3 Cir., 242 F.2d 122; Rothwacks, Law and Procedure in Criminal Tax Prosecutions, 26 Taxes 797 (1948). Consequently, the diversion of available funds to affiliates and other creditors in preference to payment of Government obligations qualifies as an affirmative act under the statute and would warrant conviction if done with the requisite state of mind.

■ It would appear that the well-settled rule of statutory construction that statutes dealing with the same general subject matter are to be construed *in pari materia* is applicable, and that the

Spies decision is determinative of the content of the subjective element required by section 2707(c).[11] There appears to be but a single salient difference between sections 145(b) and 2707(c). It is that the former deals with the defendant's taxes, while the latter involves taxes owed by others and withheld for payment to the Government. These latter tax funds constitute "a special fund" held "in trust" by the employer. Section 3661, I.R.C. of 1939, 26 U.S.C.A. § 3661. The District Court felt that the deliberate disbursement of monies held in a fiduciary capacity "which didn't belong to the defendant" is sufficient, in itself, to support a conviction under § 2707(c). Thus, it would be enough if proof was adduced that the defendant intentionally and knowingly acted in a manner which resulted in non-payment of the taxes and it is not essential that the acts were in fact done for the purpose of evading or defeating the payment of the taxes.

Is this distinction between ordinary taxes and so-called "special fund" taxes justified?

We cannot find support for such distinction in either the statute or the adjudicated cases arising thereunder. It it true that a difference exists in respect to the capacity in which the tax monies are held. But the duty to pay is the same in both instances, as is the effect of non-compliance. It may well be that the capacity in which the monies are held exposes the defendant to the risk of additional penalties for non-payment of taxes,[12] but there is nothing in any

---

11. See Hawkinson v. Commissioner of Internal Revenue, 2 Cir., 235 F.2d 747.

12. One such additional obligation for the breach of which there is a concomitant penalty is the duty to account and pay over the monies, as provided in Section 2707(c). The conclusion that the capacity in which the funds are held does not alter the content of the subjective element of a felonious attempt to evade or defeat the payment of a tax is buttressed by the provisions of Section 3661 of the Internal Revenue Code of 1939. It provides that

"Whenever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable

revenue statute which would alter the subjective element of felonious tax evasion because of the capacity in which the funds are held. It would require a clear manifestation of Congressional intent that the Internal Revenue Code should be construed to set up one rule for "special fund" taxes, and another rule for income taxes, before we could so hold. We cannot find the semblance of such Congressional intent.

The conclusion that the capacity in which the funds are held does not provide a basis for modifying the traditional subjective element of tax evasion is borne out by the cases decided under other subsections of § 2707. In Yarborough v. United States, 4 Cir., 230 F.2d 56, the Fourth Circuit affirmed a misdemeanor conviction under § 2707(a) for willful failure to file income and Social Security taxes withheld from the wages of employees. The jury was instructed in that case that willful means bad purpose, evil motive, or lack of justifiable excuse. The civil cases arising under § 2707(a) also recognize that criminal liability depends upon proof of evil motive or bad purpose. Levy v. United States, D.C., 140 F.Supp. 834; Nugent v. United States, D.C., 136 F.Supp. 875; In re Haynes, D.C., 88 F.Supp. 379; and Paddock v. Siemoneit, 147 Tex. 571, 218 S.W. 2d 428, 7 A.L.R.2d 1062. These cases hold that it is enough to warrant imposition of the civil penalty that the defendant's actions were knowingly and intentionally taken. See also Rev. Ruling 54–158, 1951–1 Cum.Bull. 247. Compare Kellems v. United States, D.C., 97 F. Supp. 681, and 50–2 USTC at 9489 (1950), and Cushman v. Wood, D.C., 149 F.Supp. 644, holding that mere intentional failure to pay is not even sufficient for civil purposes.

■ The oft-cited opinion in Paddock v. Siemoneit, supra, states that the term "willful" in criminal tax statutes refers to motive or purpose whereas in the civil

statute it characterizes intention and knowledge. The facts of that case closely parallel the instant factual situation. There it was held that the president of a corporation was civilly liable for the corporation's failure to pay withheld taxes where the reason for non-payment was that the corporation was in precarious financial condition and the withheld funds were employed to preserve the corporation. Here, too, the evidence is certainly sufficient to support a finding that the failure to pay was intentional and that the defendant was responsible for such failure. But that is not enough to justify a criminal conviction. To warrant imposition of the heaviest of penalties assessable for non-payment of taxes, the principal purpose of all such penalties being compliance, it must also be found that the defendant's conduct was prompted in part at least by tax evasion motives. This the trial court did not do.

The trial court's conception of the requisite subjective element under § 2707(c) was voiced at length during the progress of the trial and was reiterated in comments which accompanied the formal verdict. Of course, as those experienced in trial matters know full well, it is a hazardous and risky business to place too much reliance upon comments emanating from the bench during the course of a trial. The strained atmosphere of the trial arena, and the lack of opportunity for careful, studied consideration of the problem, is not conducive to dispassionate, deliberate and definitive comment. An able and alert trial judge, responsive to his responsibilities, will frequently intersperse questions and clarifying comments during the trial to clarify troublesome points, elicit certain evidence or state tentative views. Litigation would never be terminated if appellate courts seized upon isolated remarks of trial courts to award new trials. See United States v. Wain, 2 Cir., 162

with respect to the taxes from which such fund arose."

Thus, the second sentence, in terms, refutes the notion that "special fund"

taxes are a novel breed of tax to which the traditional criteria of civil and criminal responsibility are inapplicable.

F.2d 60, 65. However, there are cases where the trial court's views are set forth with certitude and clarity. This is such a case. To disregard these clear statements of the court's views, as expressed on numerous occasions, is to ignore reality. The most significant of these comments are set forth below.[13]

13. The first full exposition of the trial court's approach to the subjective element required to be proved under § 2707 (c) came during argument by appellant's counsel, Mr. Avakian, following the presentation of the Government's case-in-chief, on the motion for judgment of acquittal. After Mr. Avakian had set forth his conception of the essential elements of the offense and related them to the instant facts, he was queried as follows:

The Court: "Do you think that there is any difference with respect to this argument as between the payment of the taxpayer's own taxes and withholding taxes?

Mr. Avakian: "I don't think so, your Honor.

The Court: "I see the force of your argument and if this were a case that involved the taxpayer's own taxes—income taxes, we will say—and the full disclosure by return of the amount due, and then the handling of his business in the manner that the records here disclose that it was handled, then I see the force of the argument as to the principles that have been laid down by the courts with respect to wilfulness and acts of commission and like matters that would probably defeat a criminal charge. I am wondering whether or not there was any difference in the application of that argument in the case of taxes of someone else that the employer is required to withhold and pay, whether there is any difference there. Is the use of the trust fund, so called—they have been described as trust funds to rather loosely designate them—but does the use of the trust funds themselves give rise to an inference to wilfulness as an act of commission as differentiated from the case of the taxes due by the taxpayer himself? There is a novelty here in the application of that rule that you speak of. I was wondering if you had any thoughts concerning that." [Tr. 557]

The court continued to express the same idea.

The Court: "It seems to me that that is the bigger question, as to whether or not this doctrine which you speak of (the Spies decision) applies to a withholding tax case, and that presents a little different question than is presented in these decisions. [Tr. 564]

Finally it turned to conviction. We trace that development:

The Court: "It doesn't make any difference whether or not in using that money that the taxpayer got more money from affiliated companies than he paid out. I don't think it can stand or fall on that at all.

Mr. Avakian: "I think it is important in this respect, your Honor: Not only must there be the wilful acts of commission, but they must be done with the specific evil intent of defeating the payment. Now, that is where I think it becomes material to know whether there was a net inflow rather than an outgo because that throws light on whether there was necessary evil intent, and it is in that respect that I think it is significant to know what the flow of funds was, because if there were only a factual showing of a knowing and intentional use of these funds for some other purpose, that would not be enough. There would also have to be evidence which would support the inference and the finding that that conduct was done for the purpose of defeating the payment of the tax. That's the distinction, of course, between this type of statute that the Spies and Murdock cases talk about, where in the administration of those revenue laws, the penalty is imposed for violation of them but there must be a showing of an evil or bad motive and that good faith is a defense to the charge. Now, that's where I think the flow of funds becomes material.

The Court: "I think that what you said is a perfectly logical conclusion to be drawn from the principles of the Spies case in connection with income taxes due from a taxpayer. In other words, it would be necessary to show some affirmative action with an evil motive to use the property of the taxpayer which would be available for the payment of taxes or his monies for the purpose of defeating the purposes of those taxes. If he used his property in connection with the normal activities of his business and they proved to be untruthful or he misjudged the consequences of it, he lost it, he was thus unable to pay his taxes, of course, it wouldn't be the kind of motive that is required to prove violation of the statute. That is why it is in order to draw the line between those acts, that philosophy that we have long ago got away from, that you imprison people for debt. As Justice Jackson said in the Spies case, there has to be some affirmative act of fraud to show that something was done

A thorough grasp of them is indispensable if the problem which faces this court is to be fully comprehended.

That problem is what effect should the trial court's failure to apply the proper standard of the subjective

with the property or assets or money of the taxpayer for the deliberate purpose of evading the payment of the taxes due.

However, the question becomes, it seems to me, somewhat different when you come to the withholding taxes under this statute because there it may be very properly said that the mere act of using this money which doesn't belong to the taxpayer at all—the money that he has, that he owes for his own taxes, that is his own money, and of course there you have to go much further in order to develop a criminal charge and that's the reason for that philosophy that is expressed in the Spies and those other cases. But the question here is this was not his money. This was money that was due somebody else, but which the law imposed upon him an obligation to hold and pay the United States.

Now, the question is under the circumstances of this case of the non-payment of these monies and the obvious use of them, whether the use of the money was well intentioned or not, in the hope of making some of the enterprises work out and so forth, that the use of that money under those circumstances was a badly motivated act. And that, it seems to me, is the rather simple question that it boils down to. Of course, none of these questions are simple but it is a rather simple question to which it boils down. I don't think that it is necessary to show bookkeepingwise what the net balance was with respect to these transfers, but whether or not under the circumstances of these various corporations and companies, whether or not the use of that money under those circumstances constitutes the affirmative act that makes up the violation of the statute. And that is a bigger question, it is a broader question. All the circumstances of the case have to be taken into account, except that I don't think that what the outcome bookkeepingwise of the transactions is has anything to do with it. It is whether or not the act of using that money in connection with these various corporations is a wilful act under the circumstances, it was done knowingly, it was done consciously, all the circumstances that make up the act of withholding and non-payment, whether the circumstances surrounding that justified a conclusion that that act of non-payment and use, irrespective of what the result of it, constitutes a wilful act, that I think is the

question in this case * * *" [Tr. 568–571]

Mr. Avakian continued to urge that there was no evidence that any transfer of corporate funds was attributable to evil motivation. The trial court's reply, clearly delineating its views, follows:

The Court: "But I don't think that has anything to do with it. You are basing that upon the point that you raise that the government has to prove that the means used were with fraudulent intent. I couldn't agree with you on that, that there had to be proof by the fact of inference that any step that was taken in connection with the matter in itself, that particular step, had to be taken with the evil motive and intent to defraud the government. I couldn't follow that because we have those questions constantly raised in conspiracy cases, for example, that the particular act itself in itself may be of an innocuous nature but if it furthers the purpose of some person who is pursuing some unlawful purpose it is in itself admissible and may be considered as an overt or an act done pursuant to a purpose which is against the law. So that I don't think that it has to be shown that a particular transfer out was with that intent; I don't think that that is necessary." [Tr. 579]

During the argument to the court which preceded the rendition of the verdict, the trial court had occasion to reiterate its views. As is readily discernible no change had occurred in respect to these views throughout the presentation of the defense.

The Court: "I don't attach any particular importance to these so-called in-and-out transactions. I think I mentioned that once before in the trial of the case.

I think the District Attorney (sic) did make some contention to that effect, but I don't think it is of any importance in the case as to whether there is any evidence of any concealment or transfer of assets as such for the purpose of evasion of tax." [Tr. 925]

And again,

The Court: "Well, except that this is a withholding tax case and it is not a tax of the defendant that is involved. With respect to these taxes, the defendant is merely the collecting agent or trustee collector for the government.

Mr. Avakian: "Well, in terms of the origin of the obligation, of course that is true. But in terms of the offense that

element under § 2707(c) have upon the disposition of this appeal?

There is surprisingly little authority respecting the question of the effect upon a conviction of a trial court's misconception regarding an essential element of the offense in a non-jury case. Indeed, we find no direct authority. However, analogous decisions involving jury cases and several basic principles of criminal law furnish clear guideposts to a resolution of this issue.

Initially it should be noted that we are not concerned with such matters as the admission or exclusion of evidence or rulings on non-merit defenses. In such cases appellate courts often invoke the rule applied to civil judgments that if any valid basis exists for affirming the action taken below, such action will be affirmed regardless of the particular ground upon which the original decision was rested. Wagner v. United States, 9 Cir., 67 F.2d 656. That rule is sound and salutary and it furthers not only the ends but also the administration of justice where the erroneous theory worked no hardship nor harm upon any party.

■ But we are not dealing with a mere error of law occurring during the course of trial and which can be disregarded as harmless. Involved here, (if we are right) is a basic misconception of an essential element of the crime charged against appellant, which in truth is the critical element under the facts. We believe therefore that the comparable and controlling decisions are those jury cases involving the related questions of erroneous instructions. If this case had been tried to a jury and the comments voiced by the learned trial judge had taken the form of jury instructions, a conviction obtained thereunder could not stand under the principles enunciated in the Murdock and Spies decisions. Is there any difference between a trial judge formally instructing the jury as to what he thinks the applicable law to be and in effect instructing himself similarly in a non-jury case?[14] We think not. In each instance a conviction has resulted from the application of improper standards of law to the facts by the trier of fact. Such a case, we believe, compels reversal of the conviction.

■ It is a fundamental precept of the administration of justice in the federal courts that the accused must not only be guilty of the offense of which he is charged and convicted, but that he be tried and convicted according to proper legal procedures and standards. In short, it is not enough that the accused be guilty; our system demands that he be found guilty in the right way. Accordingly, it is no answer to the application of an erroneous standard of law that the evidence is sufficient to support a verdict reached in accordance with the proper standard of law. As the Supreme Court

is defined in the statute, I don't think it matters what kind of tax it was, and moreover——"

The Court: "Except that the instances or facts that go to make up evasion of payment are different in cases of withholding taxes than they would be with respect to the defendant's own taxes." [Tr. 935-6]

The Government contends that the comments accompanying the formal verdict show that regardless of remarks voiced during the course of the trial the verdict itself was grounded upon a correct conception of the governing law. We cannot agree. On the contrary, these comments, relied upon by the Government as the strongest expression of the applicable law made by the trial court, seem rather to reinforce the belief that a too stringent state of mind standard was applied herein. The key paragraph of those comments follows:

"I am satisfied that the evidence shows beyond question that the defendant here knowingly and deliberately set and followed a course of so operating the business of Coast Redwood Company, Inc., as to advantage himself and his companies by the use of the withheld employees' taxes; and that such course of conduct affirmatively constituted willful evasion of payment of these taxes. This he did with full knowledge and awareness of the nature of his course of conduct and of its consequences." [Tr. 963]

14. Cf., Rule 75(g), Rules of Civil Procedure, 28 U.S.C.A.; Mar Gong v. Brownell, 9 Cir., 1954, 209 F.2d 448; Takehara v. Dulles, 9 Cir., 1953, 205 F.2d 560.

stated in a jury case in response to such a contention,

"It may not be amiss to remind that the question is not whether guilt be spelt out of a record, but whether guilt has been found by a jury according to the procedures and standards appropriate for criminal trials in the federal courts." Bollenback v. United States, 326 U.S. 607, 614–615, 66 S.Ct. 402, 406, 90 L.Ed. 350.

The decisions are plentiful that an appellate court cannot affirm a conviction erroneously secured on one theory, on the speculation that conviction would have followed if the correct theory had been applied. Pearson v. United States, 6 Cir., 192 F.2d 681; People v. Bigley, 178 Misc. 552, 35 N.Y.S.2d 130; People v. Roper, 259 N.Y. 170, 181 N.E. 88; People v. Hewlett, 108 Cal.App.2d 258, 239 P.2d 150, 159; 24 C.J.S. Criminal Law § 1834, p. 676.

It does not matter whether or not guilt is a close question. The accused is entitled in any case to be tried under proper legal criteria. But the significance of this matter is all the more accentuated in a factual context where the question is a close one. This is that type of case. It may be that appellant directed disbursements in good faith and solely for the purpose of preserving the business or it may be that he so acted in part to evade or defeat the payment of taxes. It could also be that the disbursements were not made with intent to evade the payment of the taxes, but that the failure to pay was itself motivated by a desire to evade the payment of the taxes, in which case appellant could be convicted of the misdemeanor created by § 2707(b). And finally, it may be that appellant did not commit any crime, and could only be held civilly accountable under § 2707(a). All these possibilities exist.

▆▆▆ Whether particular conduct is "willful" is, of course, a question of fact.[15] By its very nature, it is not generally amenable to direct proof and must be shown by circumstantial evidence.[16] The evidence adduced in the instant case is such that a verdict following any of the foregoing alternatives, if properly found, would be sustained. But the verdict must be rendered under proper and applicable rules of law.

▆▆▆ Another point requires discussion. Ordinarily, the remedy to rectify a misconception regarding the significance of a particular fact, such as a particular state of mind, is to request special findings pursuant to the provisions of Rule 23 of the Federal Rules of Criminal Procedure, 18 U.S.C.A. Cesario v. United States, 1 Cir., 200 F.2d 232. No such formal request was made in the instant case. However, counsel for appellant repeatedly called the trial court's attention to this matter, and, as indicated previously, the trial court's remarks at the time of verdict bore on it. Moreover, counsel for the Government did not raise the point of Rule 23 on this appeal. Therefore, while we believe resort to Rule 23 ordinarily must be made to preserve such an issue on appeal, we also believe that the circumstances of this case are such that it would perpetuate an injustice to deprive appellant of the opportunity to question the propriety of the trial court's conception of the constituent elements of the offense.

▆▆▆ The other question tendered by this appeal relates to the exclusion of certain evidence, i. e., that appellant, through his attorney, had negotiated and entered into an understanding and agreement with representatives of the Internal Revenue Service in Portland, Oregon in May, 1955, whereby certain assets were to be sold to pay off Coast Redwood Company's tax obligations. The District Court took notice of the fact of the negotiations and understanding. It refused to allow the attorney to testify as to the details on the ground that such evidence was immaterial.

▆▆▆ The trial judge possesses wide latitude in the determination of the relevancy or materiality of evidence and his ruling cannot be reversed in the absence of an abuse of discretion. The evidence offered went to the defendant's state of mind. It concerned actions taken

---

15. Gaunt v. United States, 1 Cir., 184 F. 2d 284; Himmelfarb v. United States, 9 Cir., 175 F.2d 924.

16. United States v. Commerford, 2 Cir., 64 F.2d 28; Capone v. United States, 7 Cir., 51 F.2d 609, 76 A.L.R. 1534.

over three years *after* the indictment period commenced and its probative value, if any, was slight. We cannot hold under the circumstances that the trial court abused its discretion in excluding the details of the negotiations as distinguished from the fact thereof.

The judgment of conviction is reversed. The case is remanded to the District Court for reconsideration in accordance with the principles set forth in this opinion, and for further findings by the trial court, after the Government has introduced evidence, if any, and the defendant has been given the right to respond to any new evidence produced by the Government, if he desires to do so.

Reversed.

Order Modifying Opinion and Denying Petition for Rehearing.

PER CURIAM.

We consider "Appellee's Petition for Rehearing en banc" as a petition for rehearing and a suggestion (in accordance with our Rule 23, 28 U.S.C.A.) that the case be reheard en banc. With the modification of the opinion as set forth hereinabove, the petition for a rehearing before the Court as constituted for the hearing of the appeal is denied. The suggestion for rehearing en banc is rejected.